## PECK *v.* CARY.

Neither habitual intoxication nor the actual stimulus of intoxicating liquors, at the time of executing a will, incapacitates a testator, unless the excitement be such as to disorder his faculties and pervert his judgment.

For the purpose of ascertaining the testator's condition, the dispositions of the will may be examined to see, not whether they are in some degree extravagant or unreasonable, but whether they depart so widely from what would be considered natural as to be fairly referable to no other cause than a disordered intellect.

The will of a confirmed drunkard established, though executed after a protracted debauch and the testator had drank several times in the course of the day.

The attesting witnesses held to have subscribed at the request of the testator, upon evidence that the draftsman of the will had stated to the testator the necessity of having witnesses, and, upon an inquiry as to who should be obtained, calling upon three persons who were within sight and hearing and requesting them to witness R.'s will — the paper then lying upon the table near which the draftsman and testator stood — and stating in the hearing of all that R. was going to sea and was making his will, and he wished them to witness it.

The signature of the testator, or his acknowledgment thereof in the presence of the witnesses, and his publication of the instrument as his will,

held to be proved by the attestation clause and the attending circumstances, though after the expiration of two years none of the witnesses could testify that he saw the testator sign or heard him acknowledge his signature, nor could testify that he himself read, or heard read, the attestation clause, which distinctly affirmed the signature and publication in his presence.

APPEAL from the Supreme Court.   The surrogate of the city and county of New York admitted to probate an instrument purporting to be the last will and testament of Robert L. Peck, who died at New London, in Connecticut, of which State he was an inhabitant, on the 20th of September, 1859.   He left a brother of the whole blood, Frederick M. Peck, the present appellant, who contested the probate; and also two half-brothers, Ferdinand E. and Samuel N. Cary, and two half-sisters, Sarah J. Cary and Anna G. Cary, the last named being infant children of his mother by a second marriage.   By the will, executed in Norwich, Connecticut, and bearing date June 23d, 1858, he gave to his brother, F. M. Peck, the interest of $3,000, which he owed him, until Alice, the infant daughter of said Peck, should arrive at the age of twenty-one, when that debt was to be paid to her, but if she should die under age then the amount was to be retained and enjoyed by her father.   He gave a store in Pearl street, in the city of New York, and a dwelling house in the same city, and all the residue of his estate, to his two half-sisters and one of his half-brothers, S. N. Cary, and appointed Samuel C. Morgan, of Norwich, his executor.   The will had been admitted to probate by the judge of the proper district in Connecticut, after a trial in which the present appellant was the contestant.   It was propounded before the surrogate of New York by Mr. Morgan, the executor. The probate was contested on allegations of defect of testamentary capacity, and that it was not executed with the formalities required by the statute of this State.   There were three witnesses who subscribed an attestation clause in these words: "Signed, sealed, published and pronounced by the testator, as and for his last will and testament, in presence of us whose names are hereto set as witnesses, who signed our names

respectively in presence of the testator and of each other." After hearing many witnesses who were examined orally, and several depositions taken in Connecticut on commission, and some of the evidence taken before the judge of probate there, he decided to establish the will, and his decree was affirmed by the Supreme Court on appeal, upon which the present appeal was taken.

*H. A. Cram*, for the appellant.

*John Graham*, for the respondent.

DENIO, Ch. J. The appellant is not concluded or affected by the decision of the probate court in Connecticut. The transmission of the title to real estate situated in this State, either by testament, by conveyance *inter vivos*, or by intestacy, is regulated by our own laws. Whether the judgments of the court of probate in Connecticut are confined to personalty, or assume to determine upon devises of real property, they have no effect upon the title of real estate here. (Story's Confl. of Laws, §§ 474, 591; *Hosford* v. *Nichols*, 1 Paige, 220, 226.) The rule is different as to personal property, the title to which is governed by the domicil of the owner (*Parsons* v. *Lyman*, 20 N. Y., 103); and hence the respondent's counsel relies upon the circumstance, incidentally disclosed by the evidence, that the appellant is a debtor of the estate and resides in the city of New York, and that the debt is assets here; and he refers to a provision of our statutes, authorizing the granting of letters testamentary, with the will annexed, upon the production of a will which has been proved in a foreign state or country. (Laws, 1830, p. 389, § 68.) But no application was made to the surrogate under this provision. The executor sought to prove the will with a view of affecting the title to the real estate. His petition did not suggest the existence of personal assets in this State, but relied, for the purpose of showing jurisdiction in the surrogate, upon the deceased having died seized of real estate in the city of New York. The case must, therefore, be examined without reference to the Connecticut probate.

The first inquiry relates to the mental condition and capacity of the alleged testator. He was about thirty years of age at the time of signing the will, and had received a good English education. By the death of his father, and the remarriage of his mother, and her removal from the State while he was quite young, he seems to have been left without the influence of domestic restraint, and, having inherited a handsome property, was enabled to procure indulgences, the abuse of which rapidly undermined his habits, his health and moral character. For some time before making the will he had become excessively addicted to the use of spirituous liquors; had experienced several attacks of the peculiar mania arising from such habits; had more than once attempted to put an end to his existence by means of poisonous drugs; and he eventually committed suicide. Several of the witnesses stated, with some exaggeration probably, that he was scarcely ever sober. He indulged, moreover, in habits of licentiousness, not less destructive certainly to his moral character. The statement of A. B. Peckham, one of the witnesses with whom he boarded a part of the season in which the will was executed, seems to present the fair result of the evidence upon this topic. "His habits," he said, "were generally intemperate; when so, he was quarrelsome and disagreeable. When getting over his *sprees*, he was melancholy and low-spirited." It cannot, however, be maintained that he was either constantly intoxicated, or suffering from the resulting reaction; for the same witness states that while at his house he was sober and *straight* for three or four weeks, and was then bright and rational. To the same purpose are several letters written in 1856, by his brother, the appellant, then a merchant at Worcester, Massachusetts. He was anxious to have Robert, the testator, become a partner in his business by investing his money and taking part in the actual management. In one of them he says: "He is now fairly at work in the store, conducting himself as well as we could ask, and wishing to feel an immediate interest in the business." He had, however, relapsed, before the making of the will, for Mr. Morgan, the person who drew it, and was named the executor,

and who had, moreover, been his guardian during his minority, had, on account of his bad habits and consequent imprudence, been appointed his Overseer under the laws of Connecticut. The statute on that subject authorizes such an appointment to be made by the selectmen of the town, where they find any person, by idleness, gaming, intemperance, debauchery, mis-management, or bad husbandry, likely to spend and waste his estate, to be reduced to want and to become chargeable to the town. The person appointed to be his Overseer is to advise, direct and order him in the management of his business, and it is declared that no person under the appointment of an over-seer shall be capable of making a contract without his consent. This appointment, in the case of the testator, existed at the time of making the will and continued until his death; not, however, without an effort on his part to remove it, on the ground of his alleged reformation, in which some of his friends concurred. For instance, on the first day of February, in the year in which the will was executed, we find the appellant writing to Morgan—in consequence, no doubt, of the testator's importunities—that he was not just then well situated to speak correctly of his deserts, but that he had not recently heard any bad reports of him, and was inclined to think he intended to do well in future. He adds: "You must use your best judg-ment in the matter, and so far as I am concerned have my war-ranty in remitting the disagreeable penalty of Robert's past bad conduct." Among the exhibits there is a long letter from the testator to Morgan, written from New York, August 8th, 1858. The writer had, by the advice of his friends, engaged as a hand on board of a sea-going vessel which was about to sail from that port on a foreign voyage, and was, as he writes, im-mediately put to very hard labor in the preparations for setting out, which proved too severe for his badly impaired constitution, and he had left the ship. The expressed object of the letter was to obtain a supply of money to enable him to go to Savan-nah, where he hoped to find employment. It is not material to my purpose whether the statements of the letter were sincere, or whether its object was by plausible suggestions to procure a

fresh supply of money from his overseer. It is very circumstantial, perfectly perspicuous, and evinces a habit of thought, and completeness and accuracy of expression, scarcely to be expected in one not accustomed to writing, and quite remarkable for a person whose general course of conduct was such as his is represented to have been. It fully corroborates the statement of several of the witnesses, who represent him as possessed of more than average capacity when not under the influence of intemperance.

I am quite satisfied, from a careful perusal of the voluminous testimony, of which the above is a brief outline, that the testator's mental faculties were not so far impaired as to render him incompetent to make a will or do any legal act, when not under the immediate influence of intoxication.

In examining the testimony as to his condition at the precise time of signing the instrument propounded, it is necessary, in the first place, to determine whether the date affixed to it is the true one. There is evidence as to his state, relating specifically both to the 23d of June, 1858, the date which it bears, and to the 23d July following, which the appellant maintains to be the day on which it was actually executed. I am satisfied that it was executed on the last mentioned day. The will commences thus: "I, Robert L. Peck, of the town of Norwich, &c., having it in contemplation to go a voyage to sea," &c. Meach, one of the attesting witnesses, swears that when he was called upon to subscribe, Morgan, the draftsman, asked him to come and witness Robert's will, stating that he was going to sea. Clapp, another attesting witness, says that Morgan, at that time, remarked that Robert was about making his will; that he was going to sea and wished to make his will before he went; and Mr. Morgan himself, when asked how he came to write the instrument, answered: "I was requested by Robert L. Peck. He was calculating to go on a voyage to sea." It is thus made entirely clear that the immediate occasion of making the will was a contemplated sea voyage. The appellant, who was examined as a witness on his own behalf, testified that he resided in Worcester during that summer, and that on the 22d

July he received a dispatch from the testator to the effect that he intended to leave Norwich to go to sea the next day, and wished the witness to come and bid him goodbye and see him off; that he went accordingly, arriving at Norwich in the evening, and remained there through the next day. He did not see the testator set off, but ascertained, by inquiry, that he left Norwich for New York on that day, the 23d July ; that late in the afternoon of the same day he saw Morgan at his place of business, the Quinebaug Bank, who showed him a paper which he said was Robert's will, which he said he had written that afternoon. This witness is corroborated as to the day on which he came from Worcester to Norwich by two witnesses, Bynner and Bentley, the last of whom had a memorandum of the date, made at the time. Their testimony will presently be referred to for another purpose. Clapp, the attesting witness before mentioned, could not state whether the time of the execution was June or July, but he was able to recollect that at a later hour of the same day on which the will was signed he saw the testator on a car of the railroad train on the way towards New York. The letters which are made exhibits confirm this view. There is a short one from Morgan to Robert, dated the 24th June, the day following that on which the will bears date. The envelope is not preserved, and it cannot be known to what place it was addressed; but the contents are not such as would be expected if the parties had been together the preceding day, under the circumstances which existed at the making of the will. There is no allusion to any sea voyage, but the writer wishes a correct statement of Robert's debts and to whom due, that he may ascertain whether they are such as ought to be paid; he alludes to a deficiency of funds, and recommends his keeping a statement of receipts and expenses. An occasion for writing thus, or on such topics, would scarcely have arisen so soon after the parties had been together on important business. The next letter from Morgan to Robert is dated July 30, 1858, just one week after signing the will, according to the appellant's theory, and five weeks after its written date. Its contents

show that the party addressed was in the city of New York, and that he was about setting off on a voyage.   It remits a small sum of money which it appears that Robert had, by a telegram, requested might be sent.   There is no complaint that Robert had been loitering in New York, or that he had not sailed as soon as was expected, which certainly would have been looked for if he had been in the city five weeks.   The letter of August 8, 1858, already referred to, written to Morgan by Robert, when in New York, in which he gives the reason for having left the vessel on which he had embarked, corresponds better with the supposition that he left Norwich on the 23d of July than on the same day in June, as it would be only sixteen days after the later date, while it would be a month and a half after the earlier.   Against this proof there is only the actual insertion of the earlier date in the written instrument, and the supposition of Mr. Morgan that it was accurately stated.   He does not, however, speak with any positiveness, and he mentions a circumstance which shows that he might easily have been mistaken.   Being president and the manager of the bank, and a business man, he might be expected to be generally accurate in such matters.   But he says he made a journey to the west on the first day of July, and returned on the 20th or 21st. He cannot say positively whether he wrote the will before he went or after he returned, though he has an impression that it was before he set off.   A person in a steady employment, and with regular habits of business, would not be likely, at a period of the month so advanced as the 23d, to date a paper in the preceding month, unless something had occurred to interrupt his usual routine; but should he be diverted from it, and nearly a month intervene in which he should not have the accustomed practice of his pen, I think he would be quite likely to make his first dates in the month which had gone by, and I have but little doubt that this was what occurred in the present instance, and I have none whatever that the will was drawn and signed on the 23d July, 1858.   The question has no materiality except to enable us to apply the evidence respect-

Peck v. Cary.

ing the condition of the deceased at the time of the execution of the will.

The next inquiry, then, is whether the alleged testator was intoxicated at the time of signing the instrument propounded. It is not to be understood that a will made by one who is at the time under the influence of intoxicating liquor is, for that reason, void. Intoxication is said to be temporary insanity. The brain ·is, at the time, incapable of performing its proper functions ; but that species of derangement ceases when the exciting cause is removed and sobriety brings with it a return of reason. In order to avoid a will made by an intemperate person, it must be proved that he was so excited by liquor, or so conducted himself, during the particular act, as to' be, at the moment, legally disqualified from giving effect to it. (Shelford on Lunacy, 276.) The same learned writer says that incapacity arising from intoxication differs from ordinary lunacy in this, that the effects of drunkenness only subsist while the cause, the excitement, visibly lasts. There is, he adds, scarcely such a thing as latent ebriety ; so that a case of incapacity from mere drunkenness, and yet the man be capable to all outward appearance, can hardly arise ; " consequently, in cases of this description, all which is required to be shown is the absence of such excitement at the time of the act done as would vitiate it; for, under a slight degree of excitement from liquor, the memory and understanding may be as correct as in the total absence of any exciting cause." (Id., 304.) A similar rule was laid down by Sir JOHN NICHOLL, sitting in the Prerogative Court, in the case of Ayrey v. Hill (2 Addams, 206), where the validity of the will of an habitual drunkard was in question. After stating the difference between derangement from intoxication and ordinary lunacy, he adds : " Whether, where the excitement, in some degree, is proved to have actually subsisted at the time of the act done, it did or did not subsist in the requisite degree to vitiate the act done, must depend, in each case, upon a due consideration of all the circumstances of that case itself, in particular ; it belonging to a description of cases that admits of no definite rule." In such a

case it is competent, as it is the universal practice in the pro-
bate courts, to examine the dispositive parts of the will to see
whether the dispositions are extravagant and unreasonable, on
the one hand, or whether, on the other, they are such as might
probably be expected from one in the situation of the alleged
testator. The question is not, however, whether the gifts are
such as, upon the whole, we would have advised under the
same circumstances, but whether there is such a violent depar-
ture from what we would consider natural, that they cannot
fairly be referred to any cause other than a disordered intellect.
The deceased had three brothers and two sisters, but the
appellant was his only brother of the whole blood, the others
being the children of his mother by a second marriage. They
were minors, and resided with their parents at a place called
College Hill, in Ohio. The appellant either was or had been
a merchant at Worcester, Massachusetts, and had failed in
business, about the time the will was signed; whether this had
happened and was known to the deceased, at that time, is not
certain. In the letter of the deceased, before mentioned,
written a fortnight afterwards, he says he supposes Frederic
has failed, from what is said in his last letter. It is probable
that he knew enough of his circumstances to suppose he was not
solvent. The case does not disclose what relations he main-
tained with his mother's new family, except that he spent some
time with them in 1854, nor what their pecuniary circum-
stances were, except that in a letter written by the appellant
to Mr. Morgan, after he had heard of the provisions of the
will, he mentions their having relatives to take care of them.
The deceased had loaned to the appellant $3,000, with the
assent of Morgan, a few years before, which debt the will gives
to the appellant's daughter, if she survives her minority, and if
she dies under age, to the appellant, he to enjoy the interest
during the minority. The real estate in New York and the
residue of his estate is given to the half-sisters and one of
the half-brothers. The other half-brother is not mentioned
in the will, but Morgan says this was intentional, the testator
saying that he had already done as much for him as he thought

proper. What the whole value of the estate was is not stated, and all that we know of it is the mention in the will of the two buildings in New York, and, a fact which appears incidentally in the correspondence, that there was a debt due from the deceased to a savings bank in New York, probably on a mortgage on one or both of the buildings. The relations between the deceased and his elder brother appear to have been amicable, except that it is incidentally disclosed that the appellant was somewhat intolerant as to his brother's vices, and that the latter had not full confidence in the appellant's business tact, thinking, as he said, that he ought to have been a literary instead of a business man. In my judgment, there is not sufficient disclosed to show that these dispositions were extravagant or so highly unreasonable as in themselves to create any distrust of the testator's mental capacity. They certainly were not obtained by the principal beneficiaries, or by any one in their behalf, by practising upon a weak or disordered intellect. They were minor children residing at their distant home, and, so far as appears, had no friend near the testator; for Mr. Morgan is not shown to have even known them or their parents. The provisions of the will cannot, therefore, be relied on as any evidence of incapacity of the testator.

In the further examination of the evidence, we shall have to consider what degree of confidence ought to be extended to Mr. Morgan, as the writer of the instrument, and a witness upon the trial. He had been a lawyer, and was then the president of the bank occupying a room of the building in which the will was drawn. These were not disqualifying employments. He took no interest under any of the dispositions of the instrument, unless the position of executor should be considered such. But that gave him no power over the real estate in this State, and it does not appear that there was any other property except the debt due from the appellant; and he had, as before remarked, no relations with any of the devisees. But he sustained the relation of overseer of the testator, under a local statute of Connecticut, and that circumstance is strongly pressed upon us, as showing a power over him which rendered it improper that he should

have any agency in framing his testamentary dispositions. If he, or any one connected with him, had taken an interest under the instrument, the circumstance would have had considerable weight. But, in the absence of that feature, the objection does not strike me as at all serious. One of the duties of his office was to advise the testator respecting contracts and dispositions of his property *inter vivos*. This gave him no authority as to his testamentary dispositions; but one who was fit to exercise the surveillance which the position actually conferred was not, *prima fucie*, an unsuitable agent for inditing the act which should govern the succession of his estate at his death. No doubt the relationship was a confidential one, and so is that which an attorney or solicitor sustains toward his client; yet one's own lawyer has always been considered the most proper person to write his will, and it is not regarded as a favorable circumstance when he is passed by and another person is employed for that purpose. But finally, his selection for this situation, by the proper officers of the town, affords evidence that he was a man of good reputation, and one in whom confidence might be safely reposed; and there is nothing in the testimony to negative this inference.

Keeping in mind, then, that in order to vitiate the act the testator must, at the time of executing the paper, have been under the influence of intoxicating liquor, and to such a degree as to disorder his faculties and pervert his judgment, I proceed to the examination of the evidence. The persons present were Morgan, the draftsman, and Huntington, Clapp, and Meach, the attesting witnesses. The latter were mere formal witnesses who were casually present, and were called upon only because they happened, at the time, to be in the building. They knew the testator, but were not intimately acquainted with him, and one of them knew him only by sight. No conversation of any moment, which can be recollected, occurred at the time, and all they can say is that they saw nothing indicating intoxication or a want of mental capacity. As to Morgan, the case was different. He had known the testator for many years, had been his guardian while under age, and

his overseer since his majority. He knew how fatally he was given to intemperance, and had experienced not a little trouble on that account. His position made it his duty to watch over and protect him against the consequences of this vicious propensity. It was, indeed, the only purpose of his appointment. Immediately prior to the formal act of authentication, they had been together to enable the testator to give his instructions relative to the provisions to be contained in the instrument, in order that Morgan might commit them to writing; moreover, as a lawyer and man of business, he was aware of the legal as well as moral impropriety of countenancing the execution of a will by a person who was in a disordered state of mind from any cause. He declares positively that he did not discover that he was at all intoxicated at the time, and that if he had made such a discovery he should not have drawn the will. If the question stood upon this testimony alone, the appellant would have had no case, notwithstanding the notorious general habits of the testator. But the other and more remote testimony which has become applicable, by determining the day of execution to have been the 23d of July, is to be examined. The appellant, as has been mentioned, came from Worcester on the preceding evening, to take leave of the testator, on his setting off on a voyage, in company with two persons of his acquaintance, Messrs. Bynner and Bentley. He stopped at a hotel in Norwich, and, without having seen his brother, retired to an apartment which Mr. Bentley occupied with him. What follows is in his own language, and is the whole of his testimony which bears upon the question: "In the night, about half past one, I was awaked by my brother knocking at the door. He insisted on my letting him in. By his voice I discovered he was in a state of intoxication, and I objected to letting him in. I asked him where he had been. He said, up on Bean Hill to see some friends, and had been on a *spree* for several days, and excused himself, saying he was on the eve of going to sea. Mr. Bentley also objected to letting him in, and he finally went away. I saw nothing of him the next day till about noon, between 12 and 1 o'clock. He came into the hotel very

much intoxicated and gave himself an invitation to take dinner with me. I held out some fifteen minutes; kept talking with him. He then disappeared and went into a restaurant, the other side of the street." Mr. Bentley corroborates the statement as to the knocking at the door in the night, and says he judged from his manner and conversation that he was drunk. He saw him the next day, and thinks it was about ten o'clock, but had no conversation with him, and thinks he was under the influence of liquor. Mr. Bynner, the appellant's other traveling companion, relates his observation in this language: "I saw Robert S. Peck about nine or ten o'clock on the 22d, in the evening; I saw him the next morning, somewhere between eight and twelve o'clock; I saw him at the Wauregan House (the hotel). He invited me to drink with him; I saw him after, I think, at a restaurant opposite; he was drunk both times; I should say he looked more than usually dissipated; when he asked me to drink with him, I told him he had enough already; his reply was, 'I have been on a hell of a bender.'" He then told me he should either go to sea or go to hell. Another witness, Sherman, who appears to have been employed in a saloon situated just opposite the bank, testifies that on the day in question he saw the testator several times in the morning, in the saloon. He does not speak directly of his condition at that time, but he says he also saw him between two and three o'clock the same afternoon; that he came out of the bank to where the witness stood, at the front door of the saloon, and said he had just made his will; that he was going to New York on the train that night, to go to sea. As to his condition, the language of the witness is: "He was very much intoxicated; in fact, I knew of his drinking several times that day; his intoxication was such that I noticed it." The remaining witness upon this part of the case is Easterbrook, a resident of Worcester, who was, on that day, at Norwich. He says he saw the testator at the hotel shortly before dinner, which was, between one and two o'clock; talked with him some time, in the course of which he said he had been "on a spree for some days." To a direct question whether he seemed to be under

the influence of liquor at that time, he answered, "he seemed to me to be in the condition of a man who had been drinking considerably." To a question, on cross-examination, he answered: "The impression I got from his manner and conversation was that of a man who had been drinking hard and was getting over it; I cannot say that I saw anything which led me to think he did not know what he was about." This is all the testimony relating to the day on which the instrument was signed. The letter of the appellant to Morgan, of the 15th November, 1858, may be supposed to bear remotely upon the question. He mentions that he had been told by an uncle, to whom Robert had stated it, that he had made his will largely in favor of "the Cary children," the respondents; that Morgan will recollect that he had offered him the perusal of it at the bank, which must have been on the day it was executed, but that he declined to read it, and he adds: "It is very absurd, his making a will at all, without he had individual wishes to regard, but he certainly has no right, other than his making a fool of himself, to throw away any more money, to follow a considerable portion of mine, on the Carys, who have such relatives to take care of them." I do not understand the reference to the loss of his own money to relate to an appropriation of it to the Carys, or by Robert. The meaning, I think, is, that, having lost a considerable portion of his own money, it would be foolish in Robert to throw away any more, as he would do if he gave it to the Cary children. He does not suggest that Robert was in a condition to be incompetent to execute a will, though he is highly dissatisfied with the one he had heard was made, and though, by being at Norwich on the day it was executed, he would know pretty well what that condition was.

Upon this evidence, I do not think it can be affirmed that there is any real foundation for the position that the deceased was so disordered in his mental faculties, when the will was signed, as to be incompetent to execute it. It is not the law that a dissipated man cannot make a contract or execute a will, nor that one who is in the habit of excessive indulgence in

strong drink must be wholly free from its influence when performing such acts. If fixed mental disease has supervened upon intemperate habits, the man is incompetent and irresponsible for his acts. (*People* v. *Drew*, 5 Mason C. C., 28.) If he is so excited by present intoxication as not to be master of himself, his legal acts are void, though he may be responsible for his crimes. The declarations of the deceased show that he had been in a debauch five days before that on which he signed the will; but he had recovered from its immediate effects, for he spoke of it as a matter which had passed. He continued to drink, as many persons habitually do. He is not shown to have committed any extravagance or to have exhibited any insane conduct during that day. He did, it is true, indulge in improper and profane language, as coarse and intemperate men will do. The statement of Easterbrook, whose interview with him was quite proximate to the time of signing the will, does not present the case of a man so far disordered in mind as not to be able to execute any legal instrument. Then, the persons who were present at the very time of the act done, one of whom was, from previous knowledge and present observation, eminently competent to speak, saw nothing in him indicating a want of ordinary intelligence or entire sanity. When we add that there was nothing unnatural or unreasonable in the will itself, I think we cannot pronounce against it consistently with the rules of law which govern such transactions.

It remains to consider whether the instrument is shown to have been executed according to the directions of the statute of this State. That he intended to make a will which should be valid, and supposed he had done so, is evident, not only from what took place at the time, but from his subsequent declarations to the appellant's witness, Sherman. While this does not prove that he had done it in a legal way, it shows that a will has not been imposed upon him, when he did not intend to execute one. The first direction of the statute was performed. He subscribed his name at the end of the will: of that, there is no doubt. Then, three attesting witnesses signed their names,

also, at the end of the instrument. These particulars must always appear upon the face of the paper, and cannot be made to depend upon the recollections of any one. As to the other particulars: the seeing the signature made by the witness, or their hearing it acknowledged; the publication or the declaration by the testator that it is his last will and testament; and his request that they shall sign the will—these do not require or admit of any record or written memorial, other than the attestation clause, and must depend upon the recollection of witnesses; and such allowances and inferences, on account of want of memory, may be made as the justice of the case, common experience, and the rules of law permit or require. This will was written, signed and attested in a small apartment, which was the banking room of the Quinebaug Bank, of which Mr. Morgan was president, during the hours of business. It was capable of being separated into two rooms, by means of sliding doors, and when so separated the rear room was used for the sitting of the board of directors; but on this occasion the doors were not drawn together, and there was but one apartment. The will was written on Mr. Morgan's table, in the rear part, the testator being present and giving instructions; and when prepared for execution, and after it had been read by the testator, or read to him, the three witnesses were present in the front part of the room. They were Mr. Huntington, the teller of the bank, Mr. Meach, clerk of another bank in the same town, and Mr. Clapp, an employee of a railroad company; the two latter being there to deposit money in the course of their business. These four persons—Morgan and the three witnesses—unite in stating that Morgan requested the witnesses to come and witness Robert's will, two of the witnesses adding that he said he was going to sea, and was about to make his will. The three witnesses accordingly came forward and signed, Morgan and Robert being together at or near the table. The only difference between them is that Mr. Huntington will not say certainly whether the request was made by Morgan or the testator, but he says it was made by one of them. The only further remark which was proved, was made by Clapp, who, as he was

signing, said to the testator, in a pleasant way: "I hope you have left me a good slice." He says Robert nodded and smiled, but made no other reply. This remark of Clapp was heard and remembered by Morgan and Meach. As to the request: it was not actually made by the testator, but by Morgan, who had drawn and was attending in his behalf to the execution of the instrument. He was standing or sitting by and saw the witnesses come up and affix their names to the instrument, which he had read or heard read, and which he had signed, or was about to sign. Morgan had just before stated to him that it was necessary to have three witnesses to the execution, and, as he says, an inquiry was immediately made whom they should get to witness it. He does not say whether the inquiry was made by himself or by the testator, but it was evidently by one, in the presence of, and in concert with, the other. Thereupon Morgan called upon the three persons who were within hearing, to come forward and witness the will, and they came. I think they should· be held to have signed at the request of the testator. The object of the statute is that an officious signing by the witnesses, without any privity with the testator, should not be recognized as sufficient. Here, the agency of Morgan being established and known, the understanding of the witnesses, that they came forward and signed because the testator desired them to do so, and the understanding of the testator that they came and signed at his instance, was perfect, and the privity which was the purpose of the statute was secured. In *Rutherford* v. *Rutherford* (1 Denio, 23), where the proof of a will became material in an action of ejectment, it was assumed that the jury might have found a sufficient request to one of the witnesses, where it was made by the draftsman of the will, in the presence of the testator; but a new trial was ordered on another ground. In *Coffin* v. *Coffin*, it was objected that one of the witnesses signed without the request of the testator. The facts were that the two witnesses were called into the house and to the room where the will had been prepared for execution, not by the testator, but by a person acting for him. One of the witnesses inquired of the

testator if he wished him to sign or witness the paper as his will, and he answered in the affirmative, and both witnesses then signed. This was held to be a sufficient request to both. In the opinion of the court, by the Chief Judge (COM-STOCK), it is said: "The statute, it is true, declares that each witness must sign at such request. But the manner and form in which the request must be made, and the evidence by which it must be proved, are not prescribed. We apprehend it is clear that no precise form of words, addressed to each of the witnesses, at the very time of attestation, is required." In *Nelson* v. *McGifford* (3 Barb. Ch., 158), there were three attesting witnesses, and two of them were unable to swear whether it was the testator or his son-in-law, McGifford (who was present, and between whom and the testator "there seemed to be a perfect understanding on the subject"), that made the request to them to sign, one of them having a vague recollection that it was McGifford. The will was held duly proved. The Chancellor remarked: "Not only the witnesses, but the testator himself, must have understood that they were witnessing the execution of the will, in conformity with his desire and wish, although he may not have said in terms, 'I request you and each of you to subscribe your names to this my will.' If such a formal request was necessary to be proved in all cases, and the witnesses were required to recollect the fact so as to be able to swear to it after any considerable lapse of time, not one will in ten would be adjudged to be valid."

The next inquiry is, whether the testator declared the instrument to be his last will and testament, in the presence of the witnesses. This is a distinct and different thing from their witnessing the signature, or hearing an acknowledgment of his having signed it; and the want of a compliance with the statute in this particular would be fatal. It is material to this point that the attestation clause states explicitly that the instrument was "published and pronounced" by the testator "as and for his last will and testament." One of the witnesses, Huntington, was asked whether he "cast his eye" over the attestation clause, and the answer was: "I cannot remember

whether I did or not, but I usually do in such cases, and, therefore, think I did." Clapp said he was conscious that there was writing in the usual place of the attestation clause, but he did not read it; and Meach also says he did not read it. As to anything further being said beyond the request of Mr. Morgan that they should come to witness Robert's will, Clapp says that, when he had come up to the table, and they were all very near each other, Mr. Morgan remarked that Robert was about making his will; that he was going to sea and wished to make his will before he went, and wished me to witness it. He says that Robert said nothing. Subsequently he changed the expression by saying that Robert made no remark to him to his recollection. To a direct question whether he could undertake to state, after so long a time, all that was said or done on that occasion, he replied, "Certainly not." In Huntington's examination, he was asked: "Did you know what it (the instrument) was, when you signed it?" Answer: "I was told it was Robert's will." "State, if you recollect, who told you it was Robert's will?" Answer: "I cannot recollect." Again: "Did Robert state to you that the instrument to which you did affix your signature was his last will and testament?" Answer: "I cannot say whether he did or not." Meach undertakes to say that Robert did not say anything during the interview; but it will be perceived, when we come to the point of the testator's signing, or acknowledging his signature, that his memory is far from distinct as to what did take place. It should be mentioned that he is not positive whether the testator did or did not make some remark to Clapp's observation about something being left him. He says Robert said nothing that I recollect.

The testimony was taken in the autumn of 1860, considerably more than two years after the transaction to which it relates. The point whether it was, in truth, the will of Peck, the testator, was not then a matter of the least doubt or uncertainty, for each of them fully understood that it was, and acted upon that understanding, and the only point now is whether they learned it wholly from Mr. Morgan, or from him and the tes-

tator    I think the experience of every one will teach him
that upon such a question, presented under such circumstances,
mere memory is not greatly to be relied on.    If we add
to this the fact just mentioned, that they each certified under
their hands that he did declare the paper to be his last will,
it would not be safe to hold that the proper publication was
not made, whether we are ready to admit that the declaration
of the person who drew the instrument as to its character, in
the presence and hearing of the testator, and being then
employed in the business for him, would be sufficient or not.
Some cases which will be referred to under the remaining
head, will further explain my views upon this point.

We are to determine, lastly, whether the signature which
the testator made to this instrument was made in the presence
of these witnesses, or was acknowledged by him in their
presence.    We have seen that they all signed the attestation
clause, which declares that it was signed and sealed in their
presence.    In the next place, they came to the table to wit-
ness his will, and went away supposing they had done so.
The draftsman of the will, who was attending to its execu-
tion, also considered it to have been duly witnessed and
attested, and the testator left the town, with a view to sail for
foreign parts, under the same firm impression.    It would be
remarkable, and quite contrary to common experience and
observation, if it should appear that, after all, nothing of the
sort had been done, and that the prominent and only material
thing, to which all their actions tended, had been omitted.
The case must be strong, indeed, to justify such a conclusion.
But we must look at the testimony.    That the witnesses all came
up to the table together, and that they and Mr. Morgan were
there at the same time and for a sufficient period, is clearly
proved.    That the testator actually signed the will, at or
about that time, is undeniable.    Morgan swears that he was
in the act of signing his name when he called the young men
to come in.    "Whether he had risen from his seat before they
came in, I cannot say."    It was only a few steps, from ten to
fifteen feet, from the table to the place where they were stand-

ing when called. Clapp says, when he came up the will was lying on the table, and the testator was standing quite near him. It was at this instant that Morgan requested him to witness the will. He says he did not see him sign the will, and that he made no remark to him to his recollection. Huntington, to the direct question whether he saw Robert sign his name, answered, I cannot say. To the question whether Robert made any remark at this time, he could not say. Whether he was sitting or standing, when the witness came to the table, he could not tell. To the question put to Meach, "Did you see Robert sign the paper?" he answered, I think not. To test his recollection, apparently, he was asked, "Who, if any one, did you see sign the paper besides yourself?" and he answered, "I cannot remember of seeing any of the others sign it, although Mr. Clapp walked up to the table at the same time I did." Now the names of the three witnesses appear to be signed under each other in this order: Clapp first, then Huntington, and lastly this witness, Meach, himself. As it was all done in the briefest period, and without, apparently, any interval, it is not to be credited that he did not see his co-witnesses sign. He was further asked: "Did you see Robert's name to the paper at all?" Answer: "I don't remember seeing it at all." Yet that name was certainly there, and a very short distance above his own signature, and he must have seen it unless he took pains to avoid doing so.

I cannot bring myself to entertain a serious doubt that the paper was actually signed in the presence of all three witnesses. It is very true that the proponent holds the affirmative in showing that the prescriptions of the statute were complied with; but this may be inferred from circumstances, without any direct testimony, or by the evidence of one witness against that of one or more of the others. In the *matter of the Will of Eliza Ware* (25 N. Y., 425, *in note*), we held a will entitled to probate where one of the two witnesses positively denied the existence of two of the required facts; and cases are referred to in the opinion where wills have been established contrary to the testimony of all the witnesses. So

in the case of *The Trustees of the Auburn Theological Seminary*
v. *Calhoun*, at December term (*supra*), a will was upheld
against the evidence of one of the two witnesses. *Orser* v.
*Orser* (24 N. Y., 51), is a case where the only surviving wit-
ness denied the publication and the request to sign; and we
granted a new trial, the verdict being against the will, because
the circumstances, from which a due execution might be infer-
red, had not been properly left to the jury.

The new British statute of wills, passed in 1837, substan-
tially like our Revised Statutes declares that every will shall
be signed at the end or foot thereof by the testator, or some
other person in his presence and by his direction, and that
"such signature shall be made or acknowledged in the presence
of two or more witnesses; and such witnesses shall subscribe
the will in the presence of the testator." (2 Jarm. on Wills,
App., 758.) The obligation to sign in the presence of the
witnesses, or to acknowledge the signature before them, is ·
equally stringent as in the Revised Statutes. The cases in
the Ecclesiastical Courts, upon this statute, though not autho-
rity with us, are nevertheless entitled to consideration, as the
judgments of enlightened and conservative tribunals upon
the same written language which we are considering; and these
cases are very strong. In the case of *Mary Warden* (2 Curt.,
334), the testatrix had signed the will before the witnesses
came into the room. They came in consequence of having
been sent for by her. The person who had drawn the will
produced it, and told the testatrix that the witnesses had come,
to which she replied, "I am very glad of it, thank God;"
whereupon the witnesses signed their names in the presence
of the deceased. The court were of the opinion that, under
the circumstances, the signature was sufficiently acknowledged
by the testatrix under the Act of Parliament of 1837. In
*Gove* v. *Gawen* (3 Curt., 151), the will purported to have
been executed in the presence of two witnesses. One of them
swore to a perfect execution, soon after it took place; but the
other, who was examined two and a half years afterwards,
positively denied that the testator signed it in his presence,

and there was no attempt to prove an acknowledgment of the signature. Probate was decreed. Among other remarks, Sir H. JENNER FUST said, " that it must be evident that it was a matter of most serious consideration if the rights of parties are to depend upon the recollection of witnesses at any distant period of time." The same learned judge determined the case of *Gaze* v. *Gaze.* (Id., 451.) The deceased produced the will to the witnesses already signed and sealed, and either pointed out the places where they should sign, or said, " put your names below ·mine." They signed accordingly. This was held a sufficient acknowledgment of his signature ; the judge remarking, " I think it would be hypercriticism to say there has not been a sufficient compliance with the words of the act." In another case—*Blake* v. *Knight*—there were three witnesses who had signed the attestation clause. Two of them swore that the testator did not sign or acknowledge the signature in · their presence, and the other could not say whether he did or not ; but the deceased had been a lawyer ; the witnesses were all present and signed together ; and there were circumstances rendering a due execution highly probable. The will was pronounced for. The principle considered established by the reporter is this : " Positive affirmative evidence by the subscribing witness of the fact of signing or acknowledging the signature of a testator in their presence is not absolutely essential to the validity of a will. The court may presume due execution by the testator under the circumstances. (Id., 547.) In *Cooper* v. *Brockett,* the witnesses swore that the testator had not signed when they subscribed the will, but did so afterwards. It was considered that this would not be a good execution if the facts were so ; but it was thought the witnesses had mistaken the order of signing, and the will was established against their testimony. (Id., 648.)

I am satisfied that the doctrine established by these cases and those in this court is sound, and consonant with the spirit of the statute. A different rule, and one which should require the witnesses always to remember and be able to state affirmatively the several matters required to be done, would

render wills the most uncertain of all legal instruments. I think, too, that the doctrine is applicable to the decision of this case, and that the judgment of the Supreme Court ought to be affirmed.

DAVIES, WRIGHT, BALCOM and MARVIN, Js., concurred.

EMOTT, J., (dissenting.) This appeal brings before us two questions: one, of the competency of the decedent, and the other of the execution, in conformity with the statute, of the paper propounded as his will. I purpose to examine only the latter question, because I see no reason, upon such consideration as I have been able to give to the evidence, to differ with the court below upon the first point, and also because I have arrived without hesitation at a conclusion upon the latter, which makes any discussion of the testamentary capacity of the decedent unnecessary.

The statute requires four things to the execution of a valid will: 1. The signature of the testator at the end of the instrument; 2. That such signature be affixed or acknowledged by him in the presence of two witnesses; 3. The publication or declaration by the testator, to or in the presence of these witnesses, that the paper is his will; 4. The attestation and signature of the instrument by the two witnesses at the request of the testator. Each one of these acts must be performed and proved, and no court could, without repealing the statute, dispense with either upon any proof of testamentary intention or of compliance with the remaining requirements. The questions which have been discussed in the courts in respect to the execution of wills, have been questions of evidence respecting the character and the amount of testimony requisite to establish these necessary facts. Two very recent cases in this court have been referred to as relaxing the rules hitherto held by the courts in such cases, and it may be well to notice briefly these cases, and perhaps to correct any misapprehension of their bearing upon the questions presented by this appeal, before proceeding to consider the facts testified to by the

witnesses in the court below. Although every testamentary cause must rest upon its own circumstances, as well in respect to the formal execution of the testamentary papers, as to the capacity of the alleged testator, yet the application which is made of rules of law to the evidence in any given case will furnish a precedent for those which are to follow. The cases to which I refer are *Coffin* v. *Coffin* (23 N. Y., 9), and *Orser* v. *Orser* (24 id., 51). This court held, in *Coffin* v. *Coffin*, that the publication of a will, and the request to the witnesses to attest it, may be made by the same statement or declaration, and that where one of the witnesses in the presence of the other, asked the testator if he wished him to sign or witness the paper as his will, the reply of the decedent that he did, was a publication or declaration by the testator that the paper was his will, and also, under the circumstances of that case, might be considered as addressed to both the witnesses, and was such a request to them to witness the will as is required by the statute. The effect of the rule thus given, in its application to other cases, will depend very much upon the circumstances from which it is to be inferred that a request to one witness, or an answer to an inquiry by one, is a request to both as well as a publication. That the publication of the will, as well as the request to attest it, may be made by the same declaration or statement, could hardly be denied. It is easy to imagine a statement, or a sentence of assertion or reply, which would distinctly include both these particulars. What circumstances surrounding such a transaction would give to a request or a reply to one witness in the presence of the other the same effect as if it were addressed to both, must of course be decided in each case for itself. It will be found, when we come to consider the present controversy, that the respondents are not relieved from the difficulties of their proof by any thing to be inferred from the decision in *Coffin* v. *Coffin*. With regard to the case of *Orser* v. *Orser*, there is, if possible, still less in that which is at all material to the questions now before us. It is, perhaps, difficult to extract any general principle or rule from that decision. The case came up by an appeal after a jury trial of

an issue, and the questions presented arose by exceptions to rulings of the judge, with reference to particular features of the evidence and instructions asked by the counsel. All which can be gathered from the decision in this court of matter of law is, that where one subscribing witness to a will is dead, a complete attestation clause in his writing, together with the fact that he was familiar with the formalities required by law, while the surviving witness was not, and other extrinsic circumstances, may be sufficient to overcome the want of recollection of the surviving witness. No such question as that arises in this case. There is little or no difference as to the facts or between the witnesses, and no want of recollection of what took place.

I will state the facts connected with the execution of the paper propounded in this case as the will of Robert S. Peck, as they appeared in the evidence of each witness before the surrogate. The paper was executed in the State of Connecticut. It was attested by three witnesses, all of whom were examined, and also the draughtsman who prepared the paper. Edward T. Clapp, who was the first subscribing witness, testified to the following facts : He was in the banking room of the Quinebaug Bank at Norwich, in the afternoon, and as he was about to leave, Mr. Samuel C. Morgan, the president of the bank, and the person who drew the will, called him back. Mr. Morgan was seated at a table a short distance from the witness, and the decedent Peck stood near him by the table. A paper lay on the table. Mr. Morgan said to the witness, "I wish you to witness Robert's will; he is going to sea, and is making his will before he goes." Mr. Morgan pointed to the witness where to put his name, and he leaned over the table without sitting down, and wrote his name. The witness remarked pleasantly to Mr. Peck, "I hope you have left me a good slice;" to which the latter made no reply, except a smile and a nod. Nothing was said by Peck, and nothing by this witness to him, except the remark I have quoted. It is to be inferred, I think, from a portion of the testimony of this witness, that he thinks that Peck's name had been affixed to the instrument before he

signed his own name, although he does not say so. He certainly did not see Robert Peck sign the paper. After what I have related had occurred, this witness went away. Henry G. Huntington, the next subscribing witness, was at this time teller in the Quinebaug Bank. The banking room where these occurrences took place was not, I should judge, of any considerable size, but it was divided into two portions, by doors which, however, at this time, were open, and by the different use to which the front and rear parts of the room were appropriated. The front room or part of the room from which Mr. Clapp and Mr. Meech were called to the table, and where Mr. Huntington was occupied with his ordinary duties, was where the business of the bank and its customers was transacted. The back part of the building, which could be shut off by doors, as I have said, was known and used as a directors' room. Mr. Huntington, on being shown the paper propounded as the will, stated that he affixed his name to that paper in the directors' room of the Quinebaug Bank, at some time in the summer of 1858, at the request of Mr. Morgan or Mr. Peck, he could not say which. He was told it was Robert Peck's will, but he could not say by whom. Peck was somewhere within fifteen feet of him when he affixed his name as a witness. He thought he cast his eye over the attestation clause, because he usually does so in such cases, but did not remember whether he did so or not. He could not say that Robert Peck said anything in his hearing, nor did he remember Mr. Clapp speaking to him. This is the whole of his testimony. Stephen B. Meach, the third subscribing witness, was a clerk in another bank in Norwich at this time. He was in the Quinebaug Bank, standing at the counter transacting some business, when Mr. Morgan requested him to come and witness Robert's will, that he was going to sea, and was about making his will. Peck stood within ten or twelve feet of Morgan at the time. The witness went to the table and signed his name. He did not see Peck sign it, nor did he see his name signed to the paper at all. He did not run his eye over the paper, nor know what it was except by what Mr. Morgan said. He had no conversation whatever with Robert

Peck, nor did he hear him say anything or any one else speak to him except the remark made by Mr. Clapp, to which he made no answer. Nothing was said to this witness by Mr. Morgan, except what I have stated, which was spoken to him as he stood at the counter, to call him into the back room. Mr. Morgan, the person who drew the will, after detailing the circumstances preceding its execution, the instructions which he received, and that Robert Peck either read the paper or heard it read after he had drawn it in conformity to these instructions, states the circumstances of its execution in the same way. After Robert had read or heard the will, Mr. Morgan told him it was necessary to have three witnesses, and seeing the gentlemen who witnessed the will at the other side of the bank, he spoke to them, and requested them to come and witness the will as witnesses to Robert Peck's will. Morgan thinks Robert was in the act of signing his name when he called or spoke to these gentlemen. Nothing more was said by any of the parties, except the remark made by Mr. Clapp to Peck, as he was leaving, and which was testified to by the other witnesses. This is the whole of the proof as to the execution of the paper. The attestation clause is complete and full, except that it does not state any request by the testator to the witnesses to attest the paper. Such a request might be implied from the request by Mr. Morgan in his presence, but that is not the difficulty in the case. With regard to the attestation clause, however, it must be observed that it cannot be called in to supply the deficiency which exists in the proof here, because that deficiency is not a mere want of recollection by the witnesses. Mr. Huntington has but a very slight recollection of what occurred; but the statements of the other witnesses, Clapp, Meach and Morgan, are remarkably complete and coincident, and give the whole transaction without leaving anything to be inferred or supplied. These witnesses appear to me to have testified, all of them, in a truthful, candid way; and there is not the slightest reason to suppose that anything more or anything different took place, besides what they relate. That relation comes to this: Robert Peck

having signed this paper as they were in a different apartment, or in a separate portion of the apartment, Mr. Morgan, as Robert stood near him, called them, saying, "I wish you to witness Robert's will, he is going to sea and is making his will before he goes." The paper now offered for probate was lying on the table, and these three persons signed their names in a place indicated by Mr. Morgan, and retired, one of them making a casual and immaterial remark to Robert.

Now if the remark or request made by Mr. Morgan could be held as amounting to both a request to the witnesses, which it was, and also a publication of the will, which I should be inclined to think it was not; yet neither of the witnesses saw or witnessed Robert Peck's signature, and there is not the slightest proof of the acknowledgment of the signature to either of them. It is plain that it was not so acknowledged, and it is equally plain that it had been affixed to this instrument when these three persons first saw it. It is true that the paper was, beyond a reasonable doubt, signed by the decedent while they where in the banking room. But none of them saw him sign it, or had his attention drawn to what was going on, until the decedent was at least in the act of rising from the table. Signing such a paper in the same room with a witness who does not see the act, and does not know at the time that any such act is taking place, is not signing in his presence. Each of the three subscribing witnesses says, in effect, that he did not see the decedent sign his name; two of them that he had left the table, and Mr. Morgan, that he was in the act of leaving when they were first addressed. It is, therefore, impossible to infer or conclude that these persons witnessed the act of signing the paper. Their statement upon that subject is not a mere want of recollection, but is as positive as the rest of their evidence. Mr. Meach says, he thinks he did not see Robert sign the paper. Mr. Huntington has no recollection about it, and Mr. Clapp says that Morgan was seated on the table and Peck was standing near him when the former requested him, Clapp, to come and be a witness, and he went there. And he added that when he first saw Peck, he was standing and not

rising from the table, and that he was not signing when he reached the table. All this leaves no doubt that the signature was made before the witnesses' attention was attracted to the matter, and that it was not made in their presence. In order to comply with the statute, the signature, thus made, should have been acknowledged to the witnesses. There is no pretence that was done, and the proof therefore, fails.

This being a fatal and incurable difficulty, it is unnecessary to discuss the question of publication. I mean to be understood as not conceding that the proof of publication was sufficient, but I put my opinion upon the other ground.

The judgment of the Supreme Court and of the surrogate should be reversed, and a decree entered denying probate to the instrument propounded as a will.

Selden and Rosekrans, Js., expressed no opinion.

Judgment affirmed.