### *In re* PECK'S WILL.

(*Supreme Court, General Term, First Department.* December 31, 1891.)

WILLS—TESTAMENTARY CAPACITY—EFFECT OF INTEMPERATE HABITS.

 A man of intemperate habits, who had been drinking large quantities of liquor during the 10 days preceding, and was suffering from the effects of the debauch, procured his sister, who had been summoned to his home by his wife, to draw a will at his dictation, which he subscribed, and to which his sister and her husband became the attesting witnesses. By it he gave $5,000 to his infirm daughter by a former wife, who resided with and had been partly supported and educated by his sister, and gave his remaining property to his wife. At the time of making the will, his life was insured for $5,000 in his wife's favor. He died about a year thereafter. A physician who was acquainted with his habits and his condition at the time of the execution of the will, though not then attending him, testified that, in his opinion, he was at that time incapable of understanding what he was doing. The other testimony was consistent with the existence of ability to execute a will, and his understanding of the condition of his property, and it appeared that the disposition thereof was fair. *Held,* that the evidence was sufficient to support a conclusion that deceased possessed sufficient mind and memory to execute a valid will.

Appeal from surrogate's court, New York county.

Petition for probate of the will of Samuel B. Peck, deceased. Frances L. Peck, the widow of said decedent, appeals from a decree admitting the will to probate. Affirmed. See 14 N. Y. Supp. 899.

Argued before VAN BRUNT, P. J., and INGRAHAM and DANIELS, JJ.

*John J. Adams*, for appellant. *Dailey & Bell*, (*James D. Bell*, of counsel,) for respondent.

DANIELS, J. The instrument which is brought in controversy by this appeal was made on the 3d of October, 1889, about a year prior to the decease of the person by whom it was subscribed. He was a man of intemperate habits, and shortly prior to the execution of the instrument had been upon a debauch, resulting in his illness, and his confinement to his bed. His wife, about the 1st of October, wrote to the sister of Mr. Peck and her husband, living at Pawling, requesting their presence in New York to look after him. They went to the city in response to the letter, and to the residence of Mr. and Mrs. Peck. After their arrival, and in the evening of the 3d of October, and after the retirement of Mrs. Peck for the night, Mr. Peck requested his sister, Sarah B. Baker, to procure writing material for the purpose of making his will. This she did, obtaining the articles in the room indicated by him in making this request. She was then requested by him to draw his will, but expressed reluctance in doing so, because of her unfamiliarity with instruments of that description. But he insisted upon the will being drawn by her, and she sat at the table, and under his dictation proceeded to draw the instrument as he worded it. After that he arose from the bed, and proceeded to the table and read the instrument, but was not satisfied with the manner in which it had been drawn; and that was destroyed, and another instrument, being the one in controversy, was drawn in like manner under his dictation. After that had been done he again repaired to the table, and took the instrument, and read it, and made no objection to the manner in which it had been drawn. He then, according to the testimony of Mr. and Mrs. Baker, subscribed his name to it, and requested them to subscribe it as witnesses, at the same time declaring it to them to be his last will and testament. They thereupon subscribed the instrument as witnesses. The next day he went with them to Pawling, where they resided, and with whom his daughter resided, who by the instrument was made the legatee of the sum of $5,000. And after the execution of this instrument he lived for the period of about one year, and then apparently died as a victim to his habits of inebriety. This daughter had resided with his father and mother, and after that, and for a period of about eight years, resided with the witnesses to this will. Her health was infirm and delicate, and the testator assigned as a reason for making her to this extent the recipient of his property, the remainder of which was given to his widow, that he had done but very little for her, and this condition of her health; and as a matter of fact it was proved by Mr. and Mrs. Baker that they had mainly supported and educated this daughter. At the time of the making of this will the testator was interested in a dry goods business, in which he was a partner, in the city of Troy, and had obtained a policy of insurance upon his life for the sum of $5,000 in favor of his wife, the contestant of this will. There was accordingly nothing unnatural in this disposition which he made of his property, although it was not in accordance with a preceding will, made by him in the early part of the year 1889.

But on behalf of the contestant it was insisted that his habits were such as to have deprived him of the mental power or ability to make or understand the disposition which he directed should be made of his estate. Mere habits of inebriety alone are not sufficient to invalidate the will made for the final disposition of the property of the victim of such habits. This has been settled by the case of *Peck* v. *Cary*, 27 N. Y. 9. But his habits are a circumstance to be considered, so far as they may have affected his ability, and de-

prived him of the mental power requisite for the intelligent disposition of the estate; and upon those subjects the subscribing witnesses were fully examined, testifying to his mental capacity, and that he was free from restraint at the time when this instrument was subscribed by himself and these witnesses. Their evidence was clear and distinct in favor of his mental capacity, and their opinions were admissible for this purpose, because of their being subscribing witnesses to the instrument. *Clapp* v. *Fullerton*, 34 N. Y. 190; *Holcomb* v. *Holcomb*, 95 N. Y. 316. Besides that, they have related the conversations which are stated to have taken place with the deceased prior to and at the time when this instrument was made; and, if they have related those conversations correctly, they indicate the existence of such a degree of mental capacity on his part as enabled him to understand, as well as to devise, what should be and was in fact contained in this instrument. Upon this subject a physician, who had been quite familiarly acquainted with the habits and disposition of the deceased prior to and after the making of this instrument, was examined as a witness; and, while his evidence was in the first instance excluded on the ground that he had been the attending physician of the deceased, it was afterwards received by the surrogate upon the correction made by the witness that he was not at the time acting in this capacity. He, as well as the contestant and a servant residing in the family, described the habits and disposition of the deceased; and according to their testimony, especially that of the widow and the servant, he had been in the habit, for 10 days prior to the time when this instrument was drawn, of drinking nearly a quart of whisky every day; and the physician expressed his judgment that his mind had been so far affected as substantially to render him incapable of understanding what he was doing. He fully described his appearance, and from that the inference might very well have been drawn that he was not competent to make an intelligent and legal disposition of his property. But other evidence was given in the case, especially that of his sister, Mrs. Selleck, sustaining and corroborating the probability that such a degree of mental capacity was retained by him as the law has required to enable a person to make a final disposition of his property by a testamentary instrument. The witnesses all agree to his habits of inebriety, and the effect that those habits appeared to have produced upon him. But still their testimony, certainly with the exception of that of the physician, was consistent with the existence of his ability, as that was described in the testimony of the subscribing witnesses; and that he understood the condition of his property appears further from the evidence of Mr. Tuthill, who was his partner in the Troy store, and who had a conversation with him about a year before the hearing, concerning the disposition of the interest of the deceased in the store. This was not far from the time when the instrument in question was executed; and upon that occasion it appears from the evidence of this witness that an agreement was entered into by which he bought out the interest of Mr. Peck in the store for the sum, as it was finally agreed upon, of $11,500. For that he states he had given him notes, and had paid the notes with the exception of $3,500. These dealings indicate the existence of an equal degree of mental capacity with that described by the subscribing witnesses; and upon the whole case there certainly was sufficient evidence to support the surrogate in his conclusion that the deceased did possess that amount of mind and memory which is required by the law to enable a person to execute a valid will and dispose of his estate. There were exceptions taken to the ruling of the surrogate upon the admissibility of evidence, but the important exceptions were rectified by the full and complete evidence given by the physician after his statement had been corrected, by which it was made to appear that he was not an attendant physician upon the deceased. The others are of slight consequence, in no way affecting any material disposition of evidence either in favor of or against the instrument; and, under all the circumstances, there seems to be no legal

or valid reason for interfering with the decision of the surrogate admitting this instrument to probate. The decree, therefore, should be affirmed, with costs. All concur.