# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

MAY TERM, 1896.

---

ALEXANDER T. McGILL, ORDINARY.

---

ELIZA KOEGEL and JULIA HEINZ

*v.*

HENRY W. EGNER and JOHN F. ZIMMERMAN et al.

1. Inebriety, though long continued and resulting occasionally in temporary insanity, does not require proof of lucid intervals to give validity to the acts of the drunkard, as is required where general insanity is proved, consequently, where habitual intoxication is shown, there will be no presumption that incapacitating drunkenness existed at the time of making the will.

2. If it be conceded that *bona fide* attempts to commit suicide and accomplishment of suicide manifest a deranged mind, it will not follow that such derangement is inconsistent with ability to make a will. It may exist with testamentary capacity.

623

3. Proof of mere attempts to commit suicide and suicide, without more, exhibit, at best, but a temporary mental affliction, having no reference to antecedent or subsequent periods of time.

4. Where a will in English was drawn for a German, who possessed little familiarity with the English language and was habitually intoxicated, by his partner in business, who supervised the execution of the will and took substantial benefit under it, the courts, upon allegation of fraud or undue influence in the production of the instrument, will look upon such circumstances as *indicia* of fraud or undue influence, and will suspiciously weigh those circumstances in reaching its conclusion upon the issue whether the instrument was the product of fraud or undue influence. If they be not enough to raise a presumption against the instrument they will, at least, induce a suspicious scrutiny.

On appeal from a decree of the Essex county orphans court, which, upon proof, in solemn form (*per testes*), of a paper purporting to be the last will of August Meis, affirmed the prior admission of that paper to probate as such will by the surrogate of Essex county.

*Mr. Charles Borcherling* and *Mr. Schuyler B. Jackson*, for the appellants.

*Mr. William B. Guild*, for the respondents.

THE ORDINARY.

August Meis was by birth a German, and by occupation a tanner. For many years before his death he lived in the city of Newark and carried on business there. He committed suicide by shooting himself, in the yard of his factory, on the 23d of August, 1894, leaving him surviving, as the natural objects of his bounty, his widow and three children by a former wife, a son and two daughters. The daughters were the contestants below and are the appellants here.

The documents in dispute are a will, dated on the 21st of December, 1892, and a codicil thereto, dated on the 26th of September, 1893.

They are impeached by the appellants upon the grounds—*first*, that the testator was mentally incapable of making them when

Koegel *v.* Egner.

they were respectively executed; and *second,* that he was unduly influenced to make them, or they were fraudulently imposed upon him, by Henry W. Egner, his business partner.

With the exception of the signatures of Meis and the subscribing witnesses, the documents are in the handwriting of Egner, who, by them, is appointed one of their executors, and, indirectly, is made the recipient of other benefit and advantage, to which I will presently refer.

The proofs show that although Meis could speak English and, with some difficulty, read and write it, he was familiar with and habitually used the German language. About eight years before his death he entered into partnership with Egner in the business of conducting a tannery in Newark, which furnished employment for some thirty or forty men and was a prosperous and paying concern. His principal occupation in that business was the superintendency of the manufacturing and the sale of the products of the factory, while Egner, who was more proficient in the English language, did the office work—that is, kept the books, carried on the necessary correspondence and attended principally to the financial part of the business. The proofs, however, show that at times Meis was obliged to perform Egner's duties and that he possessed a sufficient knowledge of English to do so.

For fifteen or twenty years prior to his death Meis was addicted to the excessive use of intoxicating liquors, so that he was frequently drunk and occasionally remained so for days at a time. In that condition, at home, he was irritable, violent and destructive, acting sometimes as though bereft of his reason. His daughters say that at times he would be so violent that his family, in fear, would fly from the house, and he would break the dishes and furniture, and that once, while in that condition, he was so far demented as to remove his clothing and put it in the stove to burn. One of his daughters thinks that his drunken sprees would average three a week. The other says, generally, that he was constantly drinking and for years had been a brute. It is testified also by the daughters, in the vague and general terms which characterize the greater part of their testimony, that

40

upon several occasions he attempted to take his own life.   This testimony fails to give the particulars of those several attempts or any account of the causes which led to them.   The approximate dates of two only of the attempts, both by hanging himself, are stated, one immediately after the death of his first wife and the other about two years before his own death.   It does not appear whether or not the attempts at suicide and the accomplished suicide were referable to present intoxication or to nervous despondency attendant upon recovery from some continued debauch or to other causes.   That they were attributable to his habits is probable, for Mrs. Heinz says that his condition was caused by "only drinking; it was nothing but drinking."

It is admitted by the appellants that their father, when sober, was an industrious and competent business man.

It is not shown what his relations with his son were.   His daughters complain of him as having been brutal at home, and Mrs. Heinz says, vindictively perhaps, that after the death of his wife, several years before the will was made, he became so debased as to propose to her that she lead an incestuous life with him.   She adds that she recounted this proposition of her father to a neighbor and to his second wife, and thus, possibly, she discloses a reason why the father may have limited his bounty to her and her sister.

The daughters both married, and when the will was made were living with their respective husbands.

By the disputed will Meis bequeaths $2,000 to each of his daughters and $1,000, with his household effects, to his widow, and devises to his son, August Meis, Jr., all his real estate and bequeaths to him his half interest in the tannery business of Meis & Egner, requiring the son, however, to share the homestead equally with the testator's widow and pay her $4 each week during her life, and to pay all taxes, insurance, water rents, assessments &c. imposed upon the homestead.   He also prohibits the son from mortgaging and selling the homestead, and provides that at the death of the son the homestead shall go to his children, and, if he should not leave a child or children, to the children of the testator's daughters.

Doubt is expressed whether the latter proviso is not applicable also to the business real estate.

The testator was the owner not only of one-half of the business of Meis & Egner, but also of one undivided half of the real estate which constituted the tannery plant.

Another important feature of the will is that it enjoins the son to become the partner of Egner in the father's place and to continue the tannery business, and forbids him to sell his interest in the tannery real estate without the consent of Egner.

Egner and John F. Zimmerman are appointed the executors of the will.

The codicil states that on the 4th of April, 1893, the testator paid his widow $1,000 and that therefore the bequest of that sum to her in the will is revoked.

The proofs do not disclose the value of the properties left to the son, but from their description enough appears to satisfy me that his share in the estates was much greater in value than the legacies to his sisters, even though the charge upon it in behalf of the widow and his limited and incomplete estate be taken into consideration.

It does not appear that fixed mental disease resulted to Meis from his habitual and excessive use of intoxicants, nor does a presumption to that effect arise either from the proof of his habits or from such proof coupled with the testimony that at times he attempted to commit suicide and eventually did take his own life.

It is established, by abundant authority, that inebriety, though long continued and resulting occasionally in temporary insanity, does not require proof of lucid intervals to give validity to the acts of the drunkard, as is required where general insanity is proved, consequently where habitual intoxication is shown there will be no presumption that incapacitating drunkenness existed at the time of making the will. Such a condition at that time must affirmatively appear, or the presumption of capacity will prevail. *Lee's Case, 1 Dick. Ch. Rep. 193, 200.*

"It is not the law," said Chief-Justice Denio, in *Peck* v. *Cary,* *27 N. Y. 9, 23,* "that a dissipated man cannot make a contract

or execute a will, nor that one who is in the habit of excessive indulgence in strong drink must be wholly free from its influence when performing such acts. If fixed mental disease has supervened upon intemperate habits, the man is incompetent and irresponsible for his acts. If he is so excited by present intoxication as not to be master of himself, his legal acts are void, though he may be responsible for his crimes."

This judicial utterance, I think, is an excellent epitome of the conclusion of the courts upon this subject. I have had occasion to apply to it in cases which I have heretofore been called upon to decide. *Bannister* v. *Jackson, 18 Stew. Eq. 702; S. C. on appeal, 1 Dick. Ch. Rep. 593; Fluck* v. *Rea, 6 Dick. Ch. Rep. 233; S. C. on appeal, 6 Dick. Ch. Rep. 639.*

We generally attribute the act of self-destruction to a morbid condition of the mind, which may be either fixed insanity or a temporary surrender of reason. It is regarded as being in the latter condition where the object of the intended suicide is to secure relief from present pains, either in realization of affliction (mental or physical), disgrace or disaster, or where the impelling cause is the apprehension of such evils, for we cannot believe that a mind can be in normal health, even though it be cowardly and skeptical as to the future, if it accepts the uncertainty of the state after death as a relief from present mental or physical suffering. But this latter species of mental derangement, if it can be said to exist, " may be and frequently is consistent," as was said by Chief-Justice Parker in *Brooks* v. *Barrett, 7 Pick. 94,* " with the exercise of usual discretion in the management and disposition of property; indeed, the power of reasoning upon other subjects may be wholly unimpaired. The law does not consider the act of suicide as conclusive evidence of insanity. On the contrary, it is held as a crime unless insanity be proved." And more than this, it is, in its very nature, transitory, and the proof of its existence, by mere proof of an attempt at suicide, or of the act of suicide itself, by no means establishes its existence at an antecedent or subsequent period of time. No presumption of fixed or lasting mental aberration arises upon such proof.

This case presents a man who, during and after protracted

excessive indulgence in the use of intoxicating liquors, in all probability suffered from great nervous prostration and corresponding mental despondency.   It may be (the proofs, as I have said, do not give any information upon the subject) that he was in this condition when his attempts at suicide and self-destruction occurred.   It is well known that speedy and complete recovery may follow such condition.

It follows that the burden, in this case, was upon the contestants to establish incapacitating temporary insanity or drunkenness in Meis at the very times when the will and codicil were made.   *Elkinton* v. *Brick, 17 Stew. Eq. 154, 158; Lee's Case, 1 Dick. Ch. Rep. 194, 201; Fluck* v. *Rea, 6 Dick. Ch. Rep. 233, 234; Sanderson* v. *Sanderson, 7 Dick. Ch. Rep. 243, 251.* That they have failed to bear that burden is too clear to admit of discussion.   They did not attempt it.   But on the other side the subscribing witnesses produced, and Mr. Egner, relate particularly that which occurred at the execution of the will and codicil, and, if the witnesses speak truly, exhibit the testator to have been at such times in full possession of his faculties.

Passing to the insistment that the will and codicil were the products of undue influence or fraud, we find the contention to be based upon the participation of Egner in the preparation of the papers and the advantages he derives from them.   Both the papers were drawn by him.   They were both executed under his personal supervision, immediately after their preparation. He was the only partner of the testator, and as such, and because of his superior knowledge of the English language, had a strong hold upon the testator's confidence.   The will thus prepared by him not only appointed Egner an executor, but required the testator's son to immediately, upon his father's death, enter into partnership with him so that the existing business of the firm " shall," adopting the language of the will, " be carried on without delay, hindrance or interruption of any person or persons whomsoever," and forbade the son selling any part of the business property, except by Egner's consent.

These circumstances are usually reckoned among the *indicia* of undue influence and fraud, and excite suspicions, especially

in case of a testator who suffers from some mental or physical infirmity which renders him an apt subject for imposition. Here the appellants point to the habits of Meis and to his lack of familiarity with the English language and to proof that he had some difficulty in hearing.

The circumstances certainly arouse suspicion and demand their critical consideration by the court, though, in view of other circumstances in the case, they do not appear to be strong enough to raise a presumption against the instrument.

Mr. Egner was sworn as a witness in this court. He has been registrar of deeds for Essex county and appears to be a man of fair intelligence. He says that he was accustomed to occasionally draw wills; that Meis first requested him to draw the will in question and later the codicil; that some time before the will was prepared Meis instructed him as to its contents, and that after it was drawn, on the morning of its execution he and Meis went over it, Egner reading it, paragraph by paragraph, in both English and German, so that Meis as perfectly understood it as Egner did; that Meis wished his son to become Egner's partner, and that Egner stipulated that if the son should become his partner neither partner should sell without the consent of the other, and that thereupon Meis said that it was his desire that his son should not have power to sell without the consent of Egner because there was a rumor that a railroad company, named, desired to buy the tannery property, and as the son was young and inexperienced he might be induced to sacrifice his interest if he had full power to sell, and upon such discussion the restriction upon the son's power to sell was adopted.

If Mr. Egner is believed, the will was the deliberate and free act of Meis, upon a full understanding of the instrument, and when it was executed Meis was in full possession of his faculties.

I think that I should believe this witness not only because his narration is apparently candid, but because the contestants themselves satisfy me that their father, at least in a general way, understood the will. Mrs. Koegel says that eight or ten weeks before his death—that is, a year and a half after the will was made—her father was at her house and there complained that

Koegel *v.* Egner.

his son did not take an interest in his (the father's) business, and did not do right by him, and therefore he would not do all for one child but would treat them equally; and Mrs. Heinz says that two or three months before his death her father came to her house in a state of intoxication and said, as I interpret her meaning, that he had made his will but was going to make it over again and give equal shares of his property to his children. Her language is, " he was intoxicated, very full, and said he was going to make equal shares; that he had made his will but was going to make it all an equal share." She adds that he said his son was not fit to conduct a tannery.

It is inferable from these declarations that he had become, at least temporarily, dissatisfied with and disappointed in his son, and that he contemplated the abandonment of previous testamentary intentions which gave the son his tannery interest and made the division of his estate among his children unequal.

More than this, the execution of the codicil nine months after the execution of the will, manifests a knowledge of the provisions of the former instrument in favor of his wife. The evidence of the witnesses as to the verity of the codicil as his act is corroborated by the production of the check with which the $1,000 was paid to his wife.

Undoubtedly the provisions of the will that the son should take his place in the firm of Meis & Egner and that the business should continue without interruption was advantageous to Egner, but it possessed also the same advantage for the son. Moreover, there is nothing which shows that Egner ever abused the confidence of his partner. On the contrary, the proof is that he tolerated the drunkenness of Meis, and instead of taking advantage of it for his own gain, in all probability, by his fidelity to his partner's interests, saved his estate for him. Hence it is not surprising that that partner made him an executor of the will. These considerations, I think, overcome the suspicions engendered by the terms of the will and the participation of Egner in its execution.

I am satisfied that the disputed documents were properly admitted to probate, and will affirm the decree of the orphans court.