Bannister *v.* Jackson.

CAROLINE F. BANNISTER and CAROLINE J. MARSH,
appellants,

*v.*

JOHN JACKSON, respondent.

1. The test of testamentary capacity is, that the testator can comprehend the property that he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will.

2. The effect of present intoxication and mental disease, induced by habitual indulgence in intoxicants, must be measured by the test indicated, for both may exist in some degree without destroying testamentary capacity.

On appeal from Essex county orphans court.

*Mr. C. W. Riker*, for the appellants.

*Mr. M. T. Barrett* and *Mr. Henry Young*, for the respondent.

THE ORDINARY.

This appeal is from a decree of the orphans court of Essex county, which directs that a paper, purporting to be the last will and testament of George M. Bannister, be admitted to probate. The paper was executed, in accordance with the requirements of the statute, on the 24th of April, 1884, and on the 22d of March, 1887, the testator died of chronic alcoholism, at the German hospital, in the city of Newark. The appellants are his widow and only child. By the disputed paper, $500 is bequeathed to the widow, and declared to be in addition to her dower right, and $500 is given to the daughter, Caroline J. Marsh, who was then a widow, and provision is made that that sum shall be her own property, free from the control of her husband, Edward Marsh. The residue of the estate is divided equally between the four brothers of the testator, who reside in England, with the pro-

Bannister *v.* Jackson.

viso, that in case two of the brothers, who are named, should die before the testator, without leaving issue, their share shall be divided equally between the surviving brothers or their heirs. John Jackson, a friend and former business agent of Mr. Bannister, is named as the executor of the will, and power is given him to sell real estate.

The estate disposed of is valued at from $12,000 to $15,000, and consists entirely of personal property.

When the will was made, the testator and Mr. Jackson were the equitable owners of a farm at Brookdale, in this State, the legal title to which was in the name of one McCartney, who held it in trust for them, and the testator alone was the equitable owner of a house and lot in the city of Newark, the legal title to which was then held in trust for him by Mr. Jackson.

The admission of the will to probate is resisted upon the ground that, at the time of its execution, Bannister did not possess testamentary capacity. It is insisted that he had become an habitual drunkard, was afflicted with chronic alcoholism, and, at the very moment of the paper's execution, was so far intoxicated that he did not comprehend the act in which he was engaged.

Bannister was married to the appellant Caroline F. Bannister, in 1855. She had been married before, but was then a widow. By her he had a daughter, the appellant Caroline J. Marsh. Until 1875 he was a prosperous slipper manufacturer in Newark. In that year he commenced to use intoxicating liquors to excess, and, a year later, left his wife and daughter to live with a woman of disreputable character, and, from that time until his death, continued in excessive indulgence in intoxicating drink. Witnesses describe the quantity of liquor that he consumed as " enormous." When sober, he was nervous, sleepless and irritable. His hand trembled continuously. He spoke of seeing strange figures and imps, and otherwise exhibited characteristics of the habitual inebriate. Yet, notwithstanding his condition, he managed to keep his business together, and, at about the time of making the paper in question, to sell it at considerable advantage.

Sometimes he appeared to be afflicted with dullness and loss of memory, and at other times he exhibited a keen, shrewd capacity for business and a strong will. In the Spring of 1884 he declared that he had determined to go to Europe for the benefit of his health, and then made the advantageous sale of his business above spoken of, and at about the same time transferred to his mistress, in settlement of all her claims upon him, the furniture of the house in which they had lived together. He then made the will in dispute, and then, for the benefit of his health, went for two weeks to his Brookdale farm and then to England. During all the time that he was separated from his wife and daughter, except while he was in England, he contributed to their support, remitting to them weekly a certain allowance. While he was in England his daughter wrote to him for assistance, and he answered her by the following letter, which should be inserted here because of its value in ascertaining his condition of mind and capacity at the time he wrote it:

"London, July 12th, 1884.

"Carrie—Your letter just received. Glad to hear that all is well. You will please to understand that I am so placed that I cannot occupy but one home. I have for over nine years gave you and your Ma a good living. Now there is a change. If your mother wants me I will make arrangements to come and I will make her as happy as a man can make his loving wife.

"Yours,          G. M. B.

"P. S. I have sent by mail to Mr. Jackson to carry out all arrangements that you might make. Now to you my D, can you lay your head on your pillow at night and say to your God that you have been a loving faithful child? If you can then your God is not mine.          G. M. B."

In August of the same year he returned to Newark and immediately took up his residence with his wife and daughter, and remained with them until some time in the following December. He had not been able to break his pernicious habits, and, while he thus lived with them, he was seldom sober. In December he returned to his mistress and resided with her until he died, in the Spring of 1887.

For some years before he went to England he had been the vice-president and a director of the Mutual Building and Loan

Bannister v. Jackson.

Association of Newark.   When he went to England he resigned those offices, but, upon his return from England, was re-elected a director of the corporation.   The president of that association says that he was valued as a man of excellent judgment, and was frequently selected to act upon committees to audit accounts and appraise the value of property upon which loans were to be placed.   He was not thought by this witness to be incompetent to transact business until a month or two before his death. After his return he was employed by Thomas Phaup, a slipper manufacturer, as the manager and foreman of his business, and for fifteen months was paid $15 a week in that capacity.   During this employment he loaned Phaup $1,000, taking security for the loan, and so managed that he ultimately became the owner of Phaup's business.   Up to the time of his death he kept a bank account in his own name.   His money was chiefly invested in mortgages placed by himself, the interest from which he or his friend Jackson collected.   While he was in England Jackson managed his affairs and rendered him regular accounts. His securities were always kept in Jackson's safe.

The proofs satisfy me that at the time the will was made Bannister had become addicted to the excessive use of intoxicating liquors, and that, to some extent, such indulgence had impaired both his mental and physical powers, and had probably contributed to the degradation of his moral character, but, at the same time, I am satisfied that the impairment of his mental faculties did not extend so far as to render him incompetent to perform a legal act when he was not under the immediate influence of intoxication.   The test of testamentary capacity in this State is, that the testator can comprehend the property he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will.   The capacity required is moderate, and though the testator be subject to many infirmities, though he be feeble, absent-minded, forgetful, aged, diseased, blind, or otherwise infirm, if he yet possess the powers required by this test, he will be held to have testamentary capacity.   *Waddington* v. *Buzby, 18 Stew.*

*Eq. 178.* I am entirely satisfied that Mr. Bannister had testamentary capacity at the date of the document in dispute. Much stress was laid by the counsel for the appellant upon the fact that the will provided that the money which was left to the testator's daughter was to be free from the control of her husband, when, in fact, at the time the will was made, that husband had been dead two years. The daughter's marriage, her separation from her husband, the husband's death and the making of the will, all occurred while Bannister lived apart from his wife and daughter. The testimony that he had been informed of the death of his son-in-law comes from the daughter alone. Possibly she may be mistaken as to her statement of it, or possibly it may have been conveyed to him at a time when he was under the influence of strong drink and incapable of appreciating or remembering the information. His separation from his wife and daughter, and the daughter's separation from her husband, created a situation of affairs in which the death of the son-in-law would fail to disturb existing relations so as to emphasize it and impress it upon his memory. I cannot but believe that the testator's failure to remember the death when he made his will, must be attributed to other causes than disease of mind or incapacitating failure of memory.

The remaining inquiry is, whether, at the very time of making the will, the testator was under the influence of liquor? The three persons present at the execution of that paper have been sworn. John Otto, the justice of the peace and conveyancer who drew the will, was not directly questioned upon the subject, but he says that Bannister came to his office at about ten o'clock in the morning, and told him that he was going to Europe, and that he desired to arrange his affairs before he left, and then gave Otto directions for the will and, as Otto says, the ideas to put in it. Otto then told him that he must have another witness, and he went out, saying that he would get Frank J. Merz. Mr. Merz was a saloon-keeper near by. He says that Bannister came in his saloon at about eleven o'clock in the morning, and called him aside and asked him if he would be a witness to his will, and that he (Merz) assented and went with

Bannister v. Jackson.

him. He further says that Bannister was a little excited, and that he (the witness) thought that he had been drinking a little, for he smelt the liquor upon him, and Bannister seemed to be nervous. John Jackson, who was also present at the execution of the will, states that Bannister either came to him or met him that morning, and requested him to accompany him (Bannister) to Mr. Otto's office, where he proposed to have his will drawn. He told Jackson that he was going to Europe, and that he wished Jackson to be the executor of the will. Jackson says that the testator was sober and knew what he was doing. When the will was completed Mr. Otto read it, and, after it had been executed, Bannister paid Otto for drawing it and handed the will to Jackson. It may be that Bannister had been drinking immediately before his will was made. Merz says that he had been drinking a little, was a little excited, to use his expression, was "kind o' nervous," but he does not pretend to say that Bannister did not appreciate the business in which he was engaged. To Jackson he seemed to be sober, and that which he did and said throughout the transaction seems to clearly indicate that he was not intoxicated; at all events, to such a degree as to disorder his faculties or pervert his judgment. In *Peck* v. *Cary, 27 N. Y. 9, 23*, Chief-Justice Denio said: "It is not the law that a dissipated man cannot make a contract or execute a will, nor that one who is in the habit of excessive indulgence in strong drink must be wholly free from its influence when performing such acts. If fixed mental disease has supervened upon intemperate habits, the man is incompetent and irresponsible for his acts. If he is so excited by present intoxication as not to be master of himself, his legal acts are void, though he may be responsible for his crimes."

My conclusion, after a careful examination of this case, is, that at the time the will in dispute was made, Mr. Bannister's habitually excessive indulgence in strong drink had not produced a fixed mental disease sufficient to destroy his testamentary capacity, and that at the very moment of the execution of that document he was not so intoxicated that the act in which he was engaged was vitiated. I will therefore affirm the decree of the orphans court.