OF

# THE STATE OF NEW JERSEY.

FEBRUARY TERM, 1893.

ALEXANDER T. McGILL, ORDINARY.

ABRAHAM V. VAN FLEET, VICE-ORDINARY.

HENRY A. FLUCK and JACOB R. WERT, executors of
George A. Rea, deceased,

*v.*

RUNKLE REA et al.

A man may habitually indulge in intoxicants and yet possess testamentary
capacity, if at the very time of the execution of the will he was able to and
did clearly comprehend the nature and effect of the business in which he was
engaged.

On appeal from a decree of the Hunterdon county orphans
court.

*Mr. Richard S. Kuhl* and *Mr. Alvah A. Clark,* for the appellants.

*Mr. J. Newton Voorhees* and *Mr. George H. Large,* for the respondents.

THE ORDINARY.

The appeal questions the propriety of a decree of the orphans court of Hunterdon county made on the 13th of January, 1893, refusing probate of a paper purporting to be the last will and testament of George A. Rea, deceased, and allowing sundry counsel fees.

The general ground of contest is that George A. Rea lacked testamentary capacity.

Mr. Rea died on the 6th of June, 1892, at Flemington, in this state, aged seventy-two years. He was a childless widower. His next of kin are the children of three deceased sisters and two deceased brothers.

During his life he kept a boot and shoe store in Flemington, and was extensively engaged in farming and also in buying and selling hides of animals. He was the owner of several farms, which contain, in the aggregate, more than two thousand acres of land, and also of a large brick building in the business part of Flemington, and also of personal property, estimated to be worth between $35,000 and $40,000. His entire estate is worth about $160,000.

In May, 1891, he became intemperate in the use of intoxicating liquors, so that during the last six months of his life, for a large portion of the time, he was more or less under their influence.

The will in question was executed on the 12th of December, 1891, about six months before his death.

The insistment now is, that, at that time, Mr. Rea was so intoxicated that he did not comprehend the nature and effect of the business in which he was engaged.

The rule which controls this case is stated by Chief-Justice Denio in *Peck* v. *Cary, 27 N. Y. 9, 23,* in this language:

Fluck v. Rea.

"It is not the law that a dissipated man cannot make a contract or execute a will, nor that one who is in the habit of excessive indulgence in strong drink must be wholly free from its influence when performing such acts. If fixed mental disease has supervened upon intemperate habits, the man is incompetent and irresponsible for his acts. If he is so excited by present intoxication as not to be master of himself, his legal acts are void, though he may be responsible for his crimes."

I adopted this statement of the law in *Bannister* v. *Jackson, 18 Stew. Eq. 702*, which case was affirmed upon appeal. *1 Dick. Ch. Rep. 593.*

I do not find any evidence in the case to warrant a claim that a fixed mental disease had fastened upon Mr. Rea. He appears to have been a man of unusual business ability, and, up to the very time of his death, when sober, to have possessed ample capacity to efficiently manage all his business affairs. The question, then, is narrowed down to the inquiry whether, in fact, at the very time of the execution of the disputed paper, Mr. Rea was so intoxicated that he did not comprehend the nature and effect of the transaction in which he engaged. As no fixed mental disease was proved to have existed prior to the making of the will, the burden was upon the contestants to clearly and satisfactorily show that when the instrument was executed, Mr. Rea was so intoxicated that he did not intelligently appreciate that which he was doing.

The proofs to which the contestants resort are made by the testimony of three employes of Mr. Rea, and a grand-nephew, who is the son of one of the caveatrices, and Mr. John R. Foster, who mentions a single instance of intoxication. Two of the employes are so ignorant that they can neither read nor write. The first of them is William T. Carkhuff. I find this witness to be so reckless and extravagant in many of his expressions that, in view of the testimony of other witnesses, to whom I hereafter refer, I can place but little reliance in his testimony. For instance, he swears at the outstart, speaking of Mr. Rea, "I don't think he drew a sober breath from May, 1891, to his death, and certainly not for the last six months before his death."

Yet, later, he speaks of instructions that he received from Mr. Rea which indicate that Mr. Rea was unquestionably in full possession of his faculties at times. For instance, quoting from the witness—

"He would say 'that bottle sits up there;' he would hand me a silver dollar and say 'go get that bottle filled uptown;' he would tell me to bring it to the back door and set it up there on the shelf, in case anybody was in; if no one was in he would come to the back part of the store and take the bottle himself and take care of it."

It is very evident that at the giving of such instructions Mr. Rea was in possession of his senses and acute enough to conceal his secret habit His condition at such times is at variance with the impression that Mr. Carkhuff evidently sought to convey by his statement that Mr. Rea never drew a sober breath. Of the same character is the testimony of Mrs. Meyers, who was Mr. Rea's housekeeper. She testifies: "It was pretty much the same all the time; after October 1st, 1891, I never could say that I saw him sober afterwards." Yet Mrs. Meyers, when speaking of the provision of food for the household, said of Mr. Rea: "Sometimes he would get it, and sometimes he would be so drunk that he would forget it," indicating that at times Mr. Rea was sober, or, at least, sober enough to intelligently transact business.

The third witness had less opportunity to observe Mr. Rea, and is more guarded in his statements. He sums his testimony up with the conclusion that Mr. Rea was not drunk all the time, "but had liquor in him all the time." John R. Foster testifies that he had a business interview with Mr. Rea on the 10th of December, 1891, two days before the will was executed— that is, Thursday, the will being executed on Saturday—and that Mr. Rea was drunk then. There is no question as to the truth of this testimony; the witnesses upon the part of the proponents also testify to Mr. Rea's intoxication upon that day. The remaining witness for the contestants is David S. Servis, the son of one of the contestants. Servis speaks of a business transaction he had with Mr. Rea on the 24th of January, 1892. He

was apparently mistaken as to this date; the date was January 19th, but it is immaterial. Servis says that at that time Mr. Rea said to him, " I never made a will and never will make a will. The law is good enough to settle up my business after I am done with it." The object of the introduction of this testimony is manifestly to show that a little over a month after the will was made Mr. Rea did not know anything about it, leaving it to inference that he was intoxicated when the will was signed and oblivious of the transaction.

This is all the testimony against the will.

Now, upon the part of the proponents, the two subscribing witnesses swear that when the will was executed Mr. Rea was sober. One of them was a druggist who occupied a store adjoining the store of Mr. Rea, and who was a tenant of Mr. Rea, accustomed to his habits and having knowledge of his character. The other was the teller of the bank in which Mr. Rea kept his account, who, also, was familiar with Mr. Rea's character and habits. These gentlemen were together present, for about five minutes, at the execution of the instrument. They do not remember that Mr. Rea said anything more than that he acknowledged the instrument to be his will. They were satisfied, however, that he was sober. Mr. Henry A. Fluck and Jacob R. Wert, who are the executors named in the will, were also present at its execution. Prior to the execution they each had a long conversation with Mr. Rea concerning the will, and they both most positively swear that he was entirely sober and in full possession of his faculties when he signed it. As against these witnesses, at this crucial point, is the testimony of the witness Carkhuff, who says that he went into the store a few minutes before the execution of the will, and asked Mr. Rea for some money, and that then Rea was sitting at the table with a paper before him, which the witness says he was " pretending" to read, but that the witness thought that he was intoxicated, for his spectacles were half off; that in reply to his (Carkhuff's) request for money, Mr. Rea answered, " wait awhile," and went on with his reading. The testimony of Mr. Wert is, that at about the time that Carkhuff came in he had given the will to

Mr. Rea to read, and had gone to bring Mr. Fluck, who is a lawyer, to go over the will with Mr. Rea and explain its legal effect.   I think, according truth to the statement of fact made by both Carkhuff and Wert at this point, the plain reconciliation of their disagreement is, that Mr. Rea was intently reading the will while Mr. Wert was calling Mr. Fluck, and that while he was so intent, his servant, Carkhuff, came in and asked for money, and that Mr. Rea, absorbed in his work, without raising his eyes, said, " wait awhile."   The illiterate servant, of course, could not appreciate such absorption in a paper, and attributed it to intoxication.   It follows that the subscribing witnesses were right in saying that the testator was sober, and that Carkhuff ignorantly erred in his inference that the testator was intoxicated.   ·

It appears by the testimony of Mr. Wert, that on the Monday precedtng the execution of the will, Mr. Rea told him that he would like to make a will, and asked him if he had ever drawn such a document, and that Mr. Wert replied in the affirmative, and that then Mr. Rea told him that he understood that if he (Rea) died without distributing his estate by will, the children of his brothers and sisters, the brothers and sisters being all dead, would take equal shares in the estate *per capita* instead of *per stirpes*, and that he desired to have a will made so that his property would be divided into five equal shares, and one of those shares would go to the living children of each dead brother or sister ; also, he desired that the executors should have power to sell his property in such a way that it would not be subjected to the sacrifice which usually attends a forced sale.   Mr. Wert says that he drafted a will and went with it to Mr. Rea on Wednesday morning, and told Mr. Rea that he would like to have the names of his nephews and nieces, and that Rea then said that Wert did not need the names of his nephews and nieces ; that Wert misunderstood him ; that his property was to go *per stirpes* and not *per capita*.   Mr. Wert then left him, and that night consulted with Mr. Fluck, who drafted provisions for a will to carry out the testator's intention.   On Thursday, Wert saw Mr. Rea again, but found that then he was intoxicated.

That day was the 10th of January, the day on which Mr. Foster says the testator was intoxicated. On Friday, Wert submitted the matter to the testator, and found that the will was acceptable, and on Saturday morning brought the paper again to him and then went for Mr. Fluck. It was while he was away on this errand that Carkhuff made his demand upon Mr. Rea for money. Fluck says that he came to Mr. Rea's store and carefully read over and explained the will to him, and, upon Mr. Rea being satisfied with it, at Rea's request called the subscribing witnesses, and the will was executed.

Thus it appears that at the very time of the execution of the will four men saw the testator, who all unite in saying that he was free from intoxication and in full possession of his faculties. More than this, the signature to the will itself negatives the assumption that the writer was nervous or intoxicated. The signature to it is not the signature of a trembling inebriate, but the bold, rapid writing of a man in possession of power.

I find among the exhibits a bank deposit slip indicating that a deposit, to his credit, was made in the bank in which Mr. Rea kept his account, on the very day on which the will was executed. That slip contains Mr. Rea's well-written signature and two items of figures made by Rea, correctly added together.

More than this, Calvin Corle, president of the Somerset County Bank, states that in February, 1892, he had occasion to go to Flemington to prove a will, and that, after making the proof, he called to see Mr. Rea, and told him what his errand had been, and that Mr. Rea then said to him that he had found out that, if he (Rea) had not made a will, his nephews and nieces would all share in his estate alike.

Mr. John A. Bullock, a reputable member of the bar, practicing in Flemington, testifies that he also, one day in February, 1892, met Mr. Rea, and that Mr. Rea told him that he had made a will, and that possibly sometime he would want to make another.

Thus we have the testimony of two credible and disinterested witnesses that, two months after the will was made, Mr. Rea remembered both it and its provisions. Comparing the testi-

*Fluck v. Rea.*

mony of these witnesses with the testimony given by David S. Servis, I am at a loss to reconcile them, unless I believe that the testator had some purpose in making Mr. Servis believe that he had not made a will.

I have not referred to the testimony of a half dozen or more witnesses, all of whom are respected in the community in which they dwell, who speak of having time and time again, within the last year of Mr. Rea's life, seen and conversed with him when he appeared to them to be entirely free from intoxication. The sum of all the instances referred to will amount to nearly fifty, and show that at least upon that number of occasions, during the last year of his life, Mr. Rea was sober.

I cannot doubt this testimony, and when I consider it and, at the same time, recall the extravagance of much of the testimony offered by the contestants, I am satisfied, beyond all doubt, that Mr. Rea was much of his time free from intoxication.

The result of my consideration of this case is, that the will should have been admitted to probate, and that in denying it probate the decree of the orphans court is erroneous, and must be reversed.

The decree in question also makes sundry allowances to counsel. The entire decree is appealed from, and thereby the propriety of these allowances comes in question. No objection, however, was urged in this behalf upon the argument before me. I am informed by counsel that the allowances were calculated at $20 for each day's actual attendance upon the orphans court. In absence of proof to the contrary, I perceive no ground upon which I should interfere with the exercise of the orphans court's discretion in this respect. I will therefore affirm this part of the decree.

I will admit the will to probate.