Orphans Court—In re Freeman.

MIDDLESEX COUNTY ORPHANS COURT.

In the matter of the probate of the will of CHARLES M. FREEMAN, deceased.

**Wills—Probate of—Lack of Testamentary Capacity Found— Undue Influence Not Found—Fraud in Making the Will Not Found.**

On probate.

KIRKPATRICK, J.

Doctor Charles M. Freeman died a resident of this county on the 7th day of March, 1923. At the time of his death Doctor Freeman was about sixty-four years of age. He left a will, the subject of this inquiry, dated July 12th, 1922.

Doctor Freeman, about twenty years ago, married Mary E. Wilkins, a celebrated American writer. Doctor Freeman and his wife lived together in Metuchen, New Jersey, from the time of their marriage in apparent happiness and accord, until some time in 1919 or 1920. At this time Doctor Freeman and his wife separated and did not thereafter live together. It does not appear very clearly from the testimony whether any particular or specific incident or circumstance in their life brought about this separation, but it seems clear that the habits of Doctor Freeman continued over a long period of time, as hereinafter mentioned, had so completely changed his character, temperament and disposition as to make continued living together not only uncomfortable for Mrs. Freeman, but dangerous as well.

Doctor Freeman in his early life studied medicine, having graduated from the classical department of Rutgers College and from the medical school of Columbia University. He never, however, actively practiced medicine, but was for some time connected with the bureau of immigration in a medical capacity.

Orphans Court —In re Freeman.

During practically all of his adult life Doctor Freeman was engaged in the lumber, coal and building material business in Metuchen, N. J., being for many years the president and general manager of the corporation of Manning, Freeman & Son, which company was successful and did a large business throughout the central portion of Middlesex county.

Doctor Freeman never had any children. At the time of his death his next of kin and heirs-at-law were his widow, Mary E. Wilkins Freeman, and his four sisters, Sallie B. Freeman, Nellie B. Freeman, Jane Freeman and Augusta Freeman. None of his sisters ever married, and all work in some capacity to support themselves. In his early life, and up to a period shortly before his death, Doctor Freeman was a cultured and brilliant man. He was a desirable and congenial companion and a man with whom it was a pleasure to converse and to meet socially and otherwise. This is abundantly disclosed by the testimony of many of his intimate friends. The testimony, uncontradicted, discloses that Doctor Freeman, even in early manhood, over-indulged in alcoholic drink to such an extent that, as early as 1907, he either had suffered from delirium tremens or had been on the verge of an attack of that malady. He also during that period, that is as early as 1907, and from that time on to the time of his death used veronal, a drug described by medical experts as a sedative or hypnotic medicine, taken for the purpose of inducing sleep. There is also testimony that he had taken morphine and other opiates, but apparently in no very great quantity nor over a very extended period.

The doctor's use of liquor or of drugs, or both, so affected this condition that some time between 1909 and 1911 he became an inmate of an institution for the treatment for drug users and persons with drink habit. The testimony does not disclose the result of the treatment received by Doctor Freeman in this institution. We may, however, infer that it was beneficial, because we find that he did not again become an inmate of any institution until 1919, when, at the suggestion of his friend Mr. Dinwiddie, he went to an institution .

at Belle Meade, New Jersey. At that time he was unable to get into his car without assistance, and did not recognize the road that he was traveling on. He was willing to leave the car at Belle Meade only upon the promise that he could get a drink upstairs. He was utterly helpless mentally and almost so physically. Doctor Freeman remained at Belle Meade for a period of two weeks, and then, having responded to treatment, was liberated in a much improved condition.

Doctor Freeman also was a patient at Dr. Towne's sanatorium in New York City, but it does not appear whether this was before or after he was at the Belle Meade institution. Nor does it appear how long he remained at Dr. Towne's sanatorium.

In 1920 Doctor Freeman voluntarily went to the state hospital for the insane at Trenton, being induced to do so through the urging of his friend, Mr. Dinwiddie. At the end of four weeks he escaped and came back to Metuchen. In August, 1921, he was again committed, after an examination by two physicians, to the state hospital at Trenton, and remained until October 3d, 1921, when he was released upon *habeas corpus* proceedings instituted in his behalf in the court of chancery. At the time of his release, in October, 1921, the testimony discloses that he was greatly improved in physical appearance and gave evidence of marked improvement in his mental condition, and that this improvement continued for a period of about two months after his release. Early in December, however, Doctor Freeman, according to the testimony, commenced again to over-indulge in alcohol. Early in the year 1922 Doctor Freeman, who up to this time had lived in an apartment on Volkmar place over the garage used in connection with the lumber business, discontinued the services of the family of one Breen, with whom he had up to that time been living, and engaged the proponent, Harry Mohring and his wife, to come and live with him and care for his physical needs. From that time on to the time of his death Doctor Freeman continued to live in the same apartment and the proponent and his wife continued to administer to his physical wants.

In March, 1922, Doctor Freeman secured the services of an old family servant, Lettie Patterson, who came to live in his family and continued there until the time of Doctor Freeman's death. Lettie Patterson was called as a witness and testified that during the year that she was there the doctor drank and became intoxicated once a week, so that he could not control himself. His speech was thick and his thoughts scattered, and that during that time he took drugs. That on the day that he went to execute the will—he had been drinking that day—his condition was very bad, and he could not walk very good and could not talk very good, and he did not know just what he was doing. He had been drinking practically all day long that day. That he had had some drugs a couple of days before that. She also testified that she put daily, while she was with him, a half pint of liquor under his pillow, and that he would drink it during the night. That this happened every night while she was with him. Her testimony is entitled to the utmost consideration, not only because of her demeanor upon the stand, her apparent sincerity and intelligence, but also because her testimony must be considered as being against her own interest, because by the terms of the will under attack she was a beneficiary to the extent of a thousand dollars' legacy, which, if the will is denied, probate must fail.

During the last years of his life it appears that Doctor Freeman had alienated himself from many, if not all, of his former friends and companions, and that the last two years of his life his social intercourse was with persons much younger than himself and of a different social and intellectual station from those with whom he had spent the earlier years of his life. This, briefly, and without mentioning specifically the great mass of testimony from which this sketch is fabricated, shows a picture of the outstanding circumstances connected with the life and career of this unfortunate man.

After Doctor Freeman had been released from the state hospital in October, 1921, he to a certain degree managed the business of his corporation, but in May, 1922, his condi-

tion had become such that creditors of the corporation refused to continue to do business with the corporation if Doctor Freeman continued in its management. Some of the creditors discussed the advisability of having a receiver appointed because of Doctor Freeman's mismanagement or lack of management of the corporation's affairs. However, this step was not taken, but instead Doctor Freeman was pursuaded to make an assignment of his shares of stock in the corporation to Russell E. Watson, a reputable officer of this court, as a trustee. This assignment was made and Mr. Watson was elected the president of the corporation, and its business was thereafter conducted by Mr. Watson and Mr. Breen, who had long been the superintendent and active manager of the corporation's business. Shortly after Doctor Freeman had made this assignment he was introduced by Mr. Louis Mohring, the father of the chief beneficiary under the will offered for probate, to Mr. William H. K. Davey, an attorney of this state, living in Belleville and practicing in New York City. Doctor Freeman consulted with Mr. Davey with looking to the filing of a bill in chancery to set aside the assignment of his stock to Mr. Watson as trustee, and also at the same time discussed with him the making of a new will. At that time Doctor Freeman wrote out instructions for the preparation of his will in his own hand, and a will was prepared and executed by him some time in June. This will did not make any provision for his sisters. The discussion concerning the making of the will took place in Doctor Freeman's automobile in his garage with Doctor Freeman and Mr. Davey seated in the automobile, Mr. Louis Mohring, the father of the chief beneficiary, standing outside of the automobile very near by it, Mr. Harry Mohring being in and out of the garage during all of the time. This discussion extended over a considerable period of time, although I do not recall that any of the details of the discussion is testified to by anyone. After this lengthy discussion all parties went to the dining-room in Doctor Freeman's home, and there Doctor Freeman wrote a lead pencil memo-

randum, which has been offered and marked as an exhibit in this case.

At the time this memorandum was written there were present in the room Mr. Davey, Mr. Louis Mohring, Lettie Patterson and Mrs. Harry Mohring, and Mr. Harry Mohring during a portion of the time. Mr. Davey reduced the will to writing and it was executed at his house at a later date, being witnessed by Mr. Davey, by Mrs. Davey and by Mr. Louis Mohring.

Later the present will was prepared, we are told, by Mr. Davey, because Doctor Freeman was afraid that his sisters might say that because they had not been mentioned in the other will, that he had forgotten them. This second will was executed on July 12th, 1922, at Mr. Davey's house in Belleville, N. J., in the presence of Mr. Louis Mohring, the father of the chief beneficiary, Mrs. Davey, the wife of the scrivener of the will, and Mr. Davey as subscribing witness, and present in attendance upon its execution were Mr. and Mrs. Harry Mohring and their children and Lettie Patterson. Doctor Freeman arrived at Mr. Davey's house in company with the persons above named, except Mr. and Mrs. Davey, early in the evening of July the 12th. Mr. Davey had been away fishing and they were compelled to wait for some little time on Mr. Davey's veranda until he was ready to proceed with the execution of the will. Yet none of the witnesses can testify to any incident nor happening in that long wait in which Doctor Freeman engaged either in conversation or any activity that would lend to support their testimony that he was competent, sane and knew what he was doing, except the single incident of his having dropped cigar ashes on the floor, and having suggested that the ash tray should be painted a different color than the porch screen.

The subscribing witnesses to the execution of the will all testify that Doctor Freeman was sober and appeared to be of sound mind and thoroughly competent to make a will. In this they are supported by Harry Mohring and by his wife, but contradicted by Lettie Patterson. They all testify that all of the legal requirements for the valid execution of a will

were complied with, and Mr. Davey testifies that the will was read to Doctor Freeman paragraph by paragraph, and, after one or two minor changes, signed by him in the presence of all three witnesses. The will consists of three typewritten pages, fastened together with blue silk ribbon. The last page contains merely the testimonium clause, the attestation clause, the signatures of the testator and of the subscribing witnesses. No part of the body of the will appears on the last page. In physical make up, the will provides, first, for the payment of debts, then for a legacy of $10,000 to Harry Mohring, then the request of one dollar to Mrs. Freeman, $1,000 to Lettie Patterson, $200 each to his four sisters, the appointment of the residuary legatees as his executor, and then the residuary clause in which all his estate is given to Harry Mohring, the same individual mentioned in the first legacy of $10,000. The physical make up of the will is in these particulars unusual, and seems not to be based upon any logical reason.

After the death of Doctor Freeman, caveats against the probate of his will were filed by his widow and by Sallie B. Freeman, one of his sisters, attacking the probate of the will upon the ground that it was the result of undue influence; that at the time that it was made Doctor Freeman did not possess testamentary capacity and that the will was the result of fraud. I am unable to find in the testimony any support for the accusation of fraud. There is no direct testimony from which fraud could be determined, and the argument of counsel that the manner in which the will is fastened together, and the fact that no part of the body of the will appears upon the same page with the signature of the testator, has not convinced me that there was present fraud. I am further supported in this view by the demeanor of Mr. Davey, upon whose shoulders chiefly would fall any accusation of fraud. Upon the witness-stand he appeared to be frank, sincere and truthful in his statement as to the manner in which the will was executed, and I feel that the allegation of fraud must fail.

It has been argued at length and with vehemence by the counsel for the proponents that the court cannot set aside the will in question without having found that Mr. Davey was guilty of fraudulent practice, that he was a forger and a perjurer. This argument does not impress the court at all. Mr Davey may very well have been deceived into believing Doctor Freeman possessed a much greater mental capacity than he had. He may very readily have been mistaken, and honestly mistaken, as to Doctor Freeman's mental capacity. In fact, I am inclined to believe that he was over credulous, and that he did not use the care that a more prudent and less credulous individual would have done in the preparation and execution of the will in question. If he had attempted to perpertrate a fraud upon the court, I do not believe he would have left open so many doors for the entry of suspicion.

Thus we have before us the pictures of this man, feeble physically, almost blind, advanced in years and possibly aged beyond his actual years by his excessive alcoholic indulgence, separated from his friends and acquaintances of earlier years, estranged from his wife, and refusing to associate with his own sisters, surrounded by strangers in the home of a lawyer, a stranger to him, to all of his earlier associates, and only a casual acquaintance of two or three weeks, gathered together for the purpose of executing a solemn document. There was present no disinterested person, and the court does not have the benefit of a single disinterested witness to what transpired at the time of the execution of this will. No person disinterested in the result of this case can testify as to its execution. None of the subscribing witnesses attempt, with the exception of Mr. Davey, to recite any facts showing that they had attempted in any manner to find out whether or not Doctor Freeman possessed testamentary capacity. He was surrounded at the time of the execution of the will by those who would benefit by its terms, or by the friends of those who would so benefit. He had no opportunity to secure the benefit of independent advice.

Where confidential relations exist between a testator and the principal beneficiary, "slight additional evidence" will place on the beneficiary the burden of showing that testator's mind was not unduly influenced. *In re Morrise's Will, 91 N. J. Eq. 480; Sparks Case, 63 N. J. Eq. 242; Dale* v. *Dale, 38 N. J. Eq. 274.*

Doctor Freeman made Mohring his chief companion and called him "son"; he was constantly in his company; they rode miles together and frequented roadhouses and places of entertainment together. Harry Mohring was the confidant of Doctor Freeman in business and personal affairs, and he and his wife entertained Doctor Freeman at cards and generally they lived a family life together. It was through Louis Mohring that Mr. Davey was introduced to Doctor Freeman. From that time to the execution of the will the same faces appear constantly on the screen, and there was abundant opportunity to exploit, and, coupled with the circumstances surrounding the execution of the will, show the confidential relations, together with slight additional evidence, sufficient to shift the burden of proof to the proponent to show that the will was not the result of undue influence.

The proponent has stoutly protested that he exerted no influence whatever over the testator in the making of his will, and that while he knew the will was being executed he did not know he was a beneficiary under it, and that he had never discussed with the testator the provisions of his will.

I feel that his testimony must be believed and that he has satisfactorily sustained the burden of proof that was cast upon him, and that the will was not the result of undue influence exercised over the testator by the proponent.

It has been repeatedly held that the burden of neutralizing the presumption of undue influence may be set by the testimony of those implicated, where the weight of that testimony is, as it appears in this case, impeachable and convincing. *In re Morrise's Will, 91 N. J. Eq. 480,* and causes therein cited.

I am satisfied that neither the charge of fraud or of undue influence has been sustained.

The third reason urged by the caveatrixes, lack of testa-mentary capacity, remains to be considered. It has already been mentioned that Doctor Freeman was a constant periodic drinker during the major portion of his life. As already mentioned, his condition at times became so bad because of the effect of his indulgence in alcohol that it became neces-sary for his own protection and the protection of others that he be confined in institutions for the care of those mentally afflicted. He was pronounced insane by two physicians in 1921, at the time of his commitment to the state hospital for the insane. He was found by the physicians in charge at the state hospital to be insane. His physical condition indi-cated the ravage that alcohol had made in his system.

After having been in the hospital at Trenton for about six weeks he was released by order of the court of chancery on *habeas corpus* proceedings. The file of the proceedings in the court of chancery releasing him have been offered as exhibits in this case, because it is claimed by the proponents that the order of the court of chancery directing his discharge from the state hospital declares him to be sane. It appears in the recitals preceding the order that the following language has been used, "and it appearing to the chancellor that the said Charles M. Freeman is sane," &c. Then follows the order directing the discharge.

The vice-chancellor in his conclusions says: "There appears to be no condition of the kind known as in-sanity, at least under the terms of the Asylum act, and if there is no contest on the part of Mrs. Free-man nor the state, nor any further testimony to be offered, then I see nothing to be done under the statute than to direct the discharge of the patient." I take it there-fore that the determination of the vice-chancellor was merely that the deceased should be discharged from custody, and this conclusion was arrived at by him after only hearing, in an uncontested case, one side. But aside from that, it is my understanding that while the findings of lunacy or in-sanity in a collateral matter are competent evidence, they are not final upon the question of a mental capacity to make

a will. The whole effect of the findings of the court of chancery was merely that Doctor Freeman need not be longer confined, and no finding was made as to his mental capacity to transact business or make a will.

The caveatries called as expert witnesses, to show the mental capacity of Doctor Freeman, Dr. Henry M. Cotton, medical director of the state hospital for the insane at Trenton, Dr. William E. Ramsay, a physician practicing in Middlesex county, with a number of years' experience specializing in mental diseases, and Dr. Alfred L. Ellis, of Metuchen, a general practitioner. All of these men had known Doctor Freeman in his lifetime, and at one time or another examined him to ascertain his mental condition. Doctor Ramsay had known him for many years and had at one time been intimate with him socially. Doctor Ellis had lived for many years in the same community as Doctor Freeman. Doctor Cotton had had opportunity to observe Doctor Freeman upon his two periods of confinement in the state hospital at Trenton. Each of these physicians therefore was able to testify, not only in answer to the hypothetical question propounded, but from their personal observation of Doctor Freeman.

Doctor Cotton testified that upon his first admission to the asylum he was very nervous, confused and restless. His eyesight very bad. His reflexes were very sluggish. The pupils were very stiff. He suffered some from hardening of the arteries. He had an enlarged liver. Very shaky. Mentally he was restless, confused, had been smoking to excess, and used alcoholic drinks to excess for a number of years and had delirium tremens. Had lost interest in his work and home affairs. He had hallucinations of sight and hearing. He had some delusions that were not fixed however. His memory was very defective. He had been a dipsomaniac all his life. He was considerably deteriorated mentally. Had no plans for the future. He showed little, if any, improvement, and escaped from the hospital at the end of twenty-six days. And that at the time he was in the hospital he had paranoid ideas, with marked lack of judgment, showing a

dementia, a mental deterioration, designated by Doctor Cotton as alcoholic deterioration.

That upon his second admission in October, 1921, his condition was much the same, and he had been drinking to excess and taking a large amount of veronal, and seemed to be more deteriorated than at the time of his first admission, showing a progressive disease. His blood pressure was very high. He was almost blind. He had very marked delusions about his wife, claiming that she was intimate with the chauffeur, but did not suffer at that time from hallucination. That there was a very marked progression of his mental symptoms, with marked paranoid ideas against his wife, and the doctor comparing his condition upon his second admission with that of his first admission, considered that he had gone from bad to worse mentally. And in answer to a hypothetical question he testified unequivocally, that in his judgment Doctor Freeman lacked testamentary capacity on July 12th, 1922. He further testified that Doctor Freeman's condition was much worse in 1921 than in 1920. That at that time he had all the symptoms of a chronic alcoholic deterioration. He testified further that he had delusions of infidelity upon the part of his wife. Doctor Cotton definitely stated from his experiences with other cases that Doctor Freeman's condition was one of chronic alcoholic deterioration with lack of judgment, with periods of hallucinations, with delusions, and taken in connection with his use of drugs and alcohol would make him a great deal worse.

He also testified on cross-examination, in answer to direct questions, that the written memorandum which has been heretofore mentioned, indicated to him that it was the result of an insane mind. And that the will itself showed on its face lack of testamentary capacity.

Doctor Ellis testified that he had known Doctor Freeman nineteen years. Had been one of his physicians. That he had known him socially. Testified that he was not mentally able to make a will on July 12th, 1922.

Dr. William W. Ramsay testified that he had known Doctor Freeman many years. I think from 1889 or 1890.

That is some thirty years. They had been quite intimate in their early manhood. That the witness had not seen much of Doctor Freeman in the last ten or fifteen years because Doctor Freeman's change of character was so marked that their relations were not as agreeable or cordial as in early life. This change in Doctor Freeman towards Doctor Ramsay and other friends was attributed by the witness to his excessive use of alcohol. Doctor Ramsay was one of the doctors who committed him to the state hospital in 1921. At that time he was rather depressed, his responses were slow, he was indifferent to his condition, his surroundings, his eyesight was very poor, he had quite a distinct tremor, and lacked proper conception of his surroundings or of his condition. He testified that he could not say that there was an acute intoxication at that time. That there was a chronic condition from which he was suffering at that time and that this condition was an advanced stage of chronic alcoholism. He testified further that with the excessive use of alcohol a marked change in the structure of the brain takes place. The first action of alcohol is a functional disturbance. The continued use of it produces a structural disturbance. This structural disturbance is, to a very limited degree, repairable. That Doctor Freeman had reached this stage of structural disturbance and that chronic alcoholism, the disease from which he was suffering, is a chronic condition that does not improve. And that the stopping of the use of alcohol would improve the condition of the patient suffering from chronic alcoholism only in so far as it would improve the functional disturbance, but the structural condition would not change.

Thus we have the testimony of three physicians, who were personally acquainted with Doctor Freeman, that he was mentally incapable of making a will at the time this will was made.

Against this the proponents called Doctor Funkhouser. the assistant medical director at the state hospital, and Doctor Rostow, who had for a time been connected with the medical staff of that institution. Doctor Funkhouser substantially

agrees with Doctor Cotton, Doctor Ramsay and Doctor Ellis that when alcoholism has reached the chronic stage that there is no recovery from it, and testified that he is unable to state whether or not Doctor Freeman's condition was that of a chronic alcoholic.

Having in mind that he was called by the proponents and interpreting his testimony in the most favorable light to them, it cannot be said that he contradicts materially the testimony of Doctor Cotton, Doctor Ramsay and Doctor Ellis.

Doctor Rostow's testimony is that of an ordinary physician having had a limited experience with mental diseases, and while it tends to contradict that of the other physicians, is not in my opinion sufficiently credible to cause me to disregard their testimony.

It seems to me also that the very physical construction of the will itself and its provisions indicate that the will was the result of a disordered mind. It contains a legacy of $10,000 to Harry Mohring and then disposes of $1,800 in other legacies, and makes provision concerning the payment of taxes on the estate, &c., and then gives all the rest, residue and remainder to Harry Mohring, to whom the $10,000 legacy had earlier been given. It has been argued that this is a perfectly natural disposition, because he wanted to be sure that Mohring received the largest portion of his estate. If this argument correctly states the reason why Doctor Freeman made the provisions in his will, then it certainly indicates that he did not know the estate that he had to dispose of, because it is agreed that it exceeds $100,000, and this argument itself therefore demonstrates that he did not possess, at the time the will was made, one of the elements required—that is, a knowledge and comprehension of the estate that he had to dispose of.

The will and the written memorandum prepared for an earlier will, but which the will offered closely follows, support the opinion of the physicians that he lacked testamentary capacity.

Counsel for the proponents, as well as counsel for the caveatries, have cited many cases bearing upon the question of the effect of intoxication upon the execution of a will. The present case does not fall in that class of cases, but rather in those cases mentioned in the exception to the rule laid down by Chief-Justice Denio in *Peck* v. *Cary, 27 N. Y. 9, 23,* which rules has been adopted in this state in a number of cases. *Banister* v. *Jackson, 45 N. J. Eq. 702; affirmed, 46 N. J. Eq. 593,* and many others in this state. The rule laid down is as follows: "It is not the law that a dissipated man cannot make a contract or execute a will, nor that one who is in the habit of excessive indulgence in strong drink must be wholly free from its influence when performing such acts. If fixed mental disease has supervened upon intemperate habits, the man is incompetent and irresponsible for his acts. If he is so excited by present intoxication as not to be master of himself, his legal acts are void, though he may be responsible for his crimes.

In this case it appears to me that it has been abundantly proven by the witnesses that fixed mental disease has supervened upon the intemperate habits of Doctor Freeman.

Having reached this conclusion, it is necessary to determine whether or not the mental impairment resulting from this fixed disease of the brain was sufficient to render him incable from making the will.

The test of testamentary capacity in this state is whether the testator can comprehend the property he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, the distribution that is made by the will, and be able to deal rationally with those elements. The medical testimony shows conclusively that Doctor Freeman's mind was diseased. The effect of that disease was to cause him to suffer from delusions of persecution, and that his wife had been unfaithful to him, and he had in his mind towards her a fixed feeling of resentment because she had him committed to the state hospital, although any sane man would have known that her act in that regard was only for his own good.

He had turned against others who had served him many years, notably Mr. Breen, and had taken up and spent the last year of his life with comparative strangers. He became unwarrantedly suspicious of a man who worked for him for twenty years and against whom he had never felt suspicion while in his normal mental condition.

There is no doubt that he knew the nature of the business that he was engaged in when he made the will. I do not believe that he comprehended the value of his estate at the time his will was made. The will itself would indicate that he did not, and the fact that he had left over $100,000 to a man who had been in his service only about six months, and who had been adequately compensated for the services he had rendered, indicates to me that the will was an unnatural one, the act of a disordered mind, made in ignorance of the value of the estate thus bestowed upon a comparative stranger or as the result of an insane caprice. Nothing in the services rendered by Mohring to Doctor Freeman over the very short space of time that he had known him would warrant the bestowal upon him of the gift of over $100,000 as a reward for services rendered. And I can find nothing in the relations of these parties that would warrant the conclusion that such a disposition was a natural one. I am unable to find anything in the testimony justifying Doctor Freeman in disregarding the natural claims of his wife and sisters. After applying the test above mentioned, while I am convinced that Doctor Freeman knew the general objects of his bounty, the business that he was engaged in at the time the will was made, and the distribution that that will made, I am unable to find that he did know the value of the estate that he had to dispose of. And I am of the opinion that he did not have the mental capacity to deal rationally with each of those elements. His delusions of persecution, his unwarranted resentment of his wife's act in having him committed to the state hospital for the insane, his bitterness towards his sisters, were all the results of a disordered and diseased mind directly affecting the disposition of his estate.

42

In conclusion, I find that this will was made by Doctor Freeman, not as the result of undue influence exercised upon him, but was made by him at a time when he lacked the necessary mental capacity to make a valid and effectual will, and in view of this finding a decree will be made denying the will probate.