54 N.J. Super. 118 (1959)
148 A.2d 320
IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL OF GEORGE PETKOS, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued December 22, 1958.
Decided February 16, 1959.
*119 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. J. Mortimer Rubenstein argued the cause for defendant-appellant (Mr. Milton Schamach, attorney).
No appearance for plaintiffs-respondents.
The opinion of the court was delivered by CONFORD, J.A.D.
This appeal presents questions concerning the sufficiency of the publication of a will and as to testamentary capacity of the testator. The trial court found in favor of the proponent of the will on both issues. The appellant-contestant is the widow of the decedent. An attorney appeared for respondents at the argument but, as is our practice, we refused permission to argue because no brief had been filed on their behalf.
The testator operated a tavern in Paterson. He died July 23, 1957, leaving as survivors his wife, Helen, and a nine-year-old son. The wife had another son by a previous marriage. She testified on her direct case that she had lived with decedent for some years on a "trial" basis before marrying him in 1953. Under the will offered for probate, which was executed December 18, 1956, the testator left *120 the tavern to his brother and brother-in-law "on the condition that the sum of $20.00 per week is to be put in trust" for the son. In the event of sale of the tavern, one-third of the proceeds was to be "put in trust" for the son. Principal and interest on the trust fund were to be advanced to the son at 25, or so much thereof, earlier, as might be required for a college education. The remaining real estate was to be divided between the brother and the son, and the residue of the estate to go to the son under the trust. Paragraph 3 of the will states that the wife, Helen, "shall have her dower rights in any real estate I own and nothing more."

I.
We address our attention first to the question as to the sufficiency of the publication of the will.
We note at the outset that the attestation clause of the will is defective in that it omits any reference to the document as having been declared by the testator to be his last will and testament. The will was drawn for the testator by Jacob G. Goldfarb, an attorney-at-law who is also secretary to the Receiver of Taxes and Assessments of the City of Paterson. He gave the following testimony relative to its execution and publication. The decedent "dictated" the will and Goldfarb "had it drawn up." When the draft of the will had been prepared, the testator came to the city tax office, the lawyer read it to him, and the testator then read it himself. He told Goldfarb he was satisfied with it and signed it in the presence of Goldfarb and the other attesting witness, Mrs. Olga Fitzpatrick, a clerk in the tax office. The execution of the will took place in the morning, soon after the tax office opened. Before the testator signed the will Goldfarb introduced Mrs. Fitzpatrick to him, said, "This is the last will and testament of Mr. Petkos," and asked her to be a witness. At the time Mrs. Fitzpatrick was sitting at her desk, three yards from the 36-inch counter where Goldfarb and the testator were standing, Goldfarb *121 behind the counter and the testator in front of it. Thereupon the decedent signed the will, after which Goldfarb and Mrs. Fitzpatrick signed it in his presence.
Mrs. Fitzpatrick, called as a witness, identified her signature on the will and that of Goldfarb. She said she recognized the testator's signature on the will. She testified she was present when Petkos signed his name and that both Petkos and Goldfarb were present when she signed her name. She further stated that Mr. Goldfarb had said in the "sight and hearing" of herself and Petkos, that this document "was the last will and testament of this Mr. Petkos." On cross-examination, Mrs. Fitzpatrick testified that at the time of the signing of the will and the attestation clause all three of the persons mentioned were standing at the counter and the signing took place at the counter. She confirmed Goldfarb's testimony as to her introduction to Petkos, the identification of the paper as the will of Petkos and the request that she be a witness. She said she answered Goldfarb that she would be a witness. All signed, but she did not remember in what order. They "all signed watching one another." Petkos said nothing.
The position of the defendant, essentially, is that the foregoing proofs do not constitute sufficient evidence of conformity with the statutory requirement that the will be declared to the subscribing witnesses by the testator to be his last will and testament; in other words, published to them by the maker of the testament. In re Hale's Will, 21 N.J. 284 (1956). The lack of a perfect attestation clause places the burden of proof on the proponent of the will to establish by positive proof all of the statutory requisites, including publication. In re Abbott's Estate, 1 N.J. Super. 298, 300 (App. Div. 1949). The cases dealing with the statutory requisite of declaration or publication of a will (N.J.S. 3A:3-2) are dealt with at length in In re Hale's Will, supra. But the range of the attack on the mode of compliance with the requirement in the case before us is narrow. It focuses on the absence of proof of any objective action by the testator during the episode of *122 execution and witnessing of the will, prior to his actual subscription of the document, to indicate approval or acquiescence on his part in respect to Goldfarb's signification to the witness, Mrs. Fitzpatrick, that the document was his last will and testament and that it was desired that she act as a witness of its execution.
Defendant concedes that the testator may make another person, such as the scrivener of the will, his agent for the purpose of communicating his declaration to the attesting witnesses but she asserts that in such case it is an absolute essential that the testator signify, in advance of his actual signing of the testament, his approval of or acquiescence in the words of the agent by an observable act such as a nod, word or other physical sign. For this position she relies upon the Hale case, supra, and others cited therein (21 N.J. at pages 296, 297). Although it must be candidly conceded that the opinion in Hale is susceptible of such an interpretation, at least by indirection, the facts of that case preclude any construction of the opinion as a holding to the effect contended for. There was no declaration in that case either by the testator or any one else on his behalf to the witnesses while assembled with the testator that the document they all signed was his last will, nor was there any request at that time, by him or on his behalf, that the witnesses sign the document as such.
The only case cited to or discovered by us which lends any support on its facts to the appellant's position is In re Ferris' Will, 115 N.J. Eq. 115 (Prerog. 1934), affirmed 117 N.J. Eq. 20 (E. & A. 1934). But that decision, denying probate of a will in which an octogenarian in poor health had bequeathed her entire estate to her nurse, involved the complication of deafness of the testatrix and a consequent gap in the communication of the adopted declaration between testatrix and witness.
On the other hand, three reported decisions, one of them in the former Court of Errors and Appeals, accord express sanction to the concept that expression by a scrivener in the presence of testator and witnesses of the fact that the instrument *123 about to be signed is the last will of the testator and that it is desired that the witnesses act in that capacity, will suffice as a statutory declaration without any further objective indicium of concurrence by the testator beyond his execution of the will in the presence of such witnesses. The earliest of these cases, Mundy v. Mundy, 15 N.J. Eq. 290, 293 (Prerog. 1858), is practically a holding to the effect stated. In that case there was a reversal of an Orphans' Court decree denying probate of a will. Of three attesting witnesses, one was deceased, one was unable to remember the execution of the will, and the best recollection of the third was that she had been asked by her husband, in the presence of the testator, to witness what it was understood was the last will and testament of the testator, but that the latter had said nothing, but merely signed. In sustaining probate the court said (at pages 293, 294):
"There must be some declaration by the testator that it was his will, and a communication by him to the witnesses that he desires them to attest it as such. But this need not be done by word  any act or sign by which that communication can be made is enough. The scrivener, in the presence of the testator, says, this is the will of A B., and he desires you to witness it  the testator standing by  is a sufficient publication or declaration." (Emphasis ours.)
The foregoing unequivocal statement of the law has never, to our knowledge, been disapproved in any later New Jersey case. The Mundy decision is not unknown to our present-day courts. It was cited with approval, albeit in another connection, in In re Hale's Will, supra (21 N.J. at page 296), as well as in In re Abbott's Estate, supra (1 N.J. Super. at page 300). The other cases in which the substance of the quoted excerpt is repeated as good law are Turnure v. Turnure, 35 N.J. Eq. 437, 439 (Prerog. 1882), affirmed o.b. in 37 N.J. Eq. 629 (E. & A. 1883), and Manners' Case, 72 N.J. Eq. 854 (Prerog. 1907). The opinion in the last cited case accommodates the rule in the Mundy case to the language from earlier decisions reiterated in Hale, as follows (72 N.J. Eq. at page 855):
*124 "it is settled law that a testatrix may publish a will by assenting to a statement made in her presence. Such an assent may be made by some act or sign. If the scrivener declared, in the hearing of the testatrix, that the paper was her will and she had then signed it, publication might be inferred."
It is our considered opinion that neither In re Hale's Will nor any of the other cases relied upon by defendant are properly to be regarded as rejecting the rule in the Mundy case. Moreover, that rule appears to us fully consonant with the rationale of the statute and the authoritative interpretative cases. It is evident that an able-bodied testator, in full possession of his faculties, who stands by in the immediate presence of a lawyer-scrivener and a prospective witness to the execution of a will, and hears the scrivener tell the witness that the document before them is the testator's last will and testament and that the latter desires him to witness the execution of the instrument, is adopting the declaration of the will as his own act and communicating his publication of it to the witness fully and unequivocally by signing it then and there, and remaining in the presence of the witness while the latter signs it in his turn. In such case, there being nothing else to indicate the contrary, "enough" has been "said or done in the presence of and with the knowledge of the testator to cause the witnesses to understand distinctly that the testator desires them to know that the paper produced is his will which they are to attest as such." In re DuBois' Estate, 9 N.J. Super. 280, 285 (App. Div. 1950). To require, over and above the foregoing, a nod of the head or a murmur or other objective manifestation by the testator of concurrence as an absolute prerequisite to a legally operative declaration in such circumstances would, in our judgment, come close to substituting a fetish for a rule of reason. It might well lead, particularly where the will was executed a long time previous to death, to the injustice of the miscarriage of a will fully intended by the testator to be his last testament and actually understood by the witnesses of his execution of it to have been intended to be represented by him to them as such. *125 This, in our view, would subserve neither justice nor the salutary purpose of the statute to prevent frauds, compulsions or impositions upon the unwary. Cf. In re Hale's Will, supra (21 N.J. at page 297). On the contrary, it would merely penalize candor on the part of attesting witnesses.
There was clear and positive proof in the case before us of a publication of the will accordant with the rule in the Mundy case. From the proofs the trial judge could well have found that the testator, the scrivener, who also served as an attesting witness, and the other attesting witness were in the immediate presence and hearing of each other; that the scrivener introduced the testator to Mrs. Fitzpatrick, told her the document was Petkos' last will and testament and asked whether she would act as a witness; that she said she would, and that thereupon Petkos signed it and waited there while Goldfarb and Mrs. Fitzpatrick did likewise. Petkos was, to all appearances, in possession of his faculties and able to hear and understand what the others were saying and to see what they were doing. The inference of communication from Petkos to the others of an adoption by him of Goldfarb's publication of the will as that of the testator and of the request that Mrs. Fitzpatrick witness it is not only permissible, but fairly inescapable. Publication having been established by positive proof, the trial finding thereof must be sustained.

II.
The alternative basis for the attack upon the will is that the testator was incapacitated to execute it because under the influence of alcohol.
There was testimony that the decedent drank excessively over a long period of time, and, as a matter of fact, died at the age of 47 of cirrhosis of the liver caused by chronic alcoholism. There was also proof that he had been drinking heavily the day before the execution of the will; that he had had a number of drinks on the morning he signed the *126 will; and that he had told a companion with whom he was drinking that he was going out to make a will "and he wanted to fix his wife to make sure she would have to work when he was gone." There was other testimony that he was mean and hostile to his wife at times when he was drunk but that at other times he was friendly and congenial with her. The executor offered countering testimony that testator became angry with his wife only on occasions when she made unjustified accusations against him, such as consorting with other women.
The decedent took out an insurance policy making his wife the beneficiary February 18, 1957. This, argues defendant, indicates he must have been unaware that he had made a will disinheriting her when he was drunk. But decedent's brother testified that at 5:00 P.M. on the day the will was executed, decedent came to his home, showed him the will, asked him to read it, and then told him to retain possession of it and tell no one about its contents. His condition at the time was sober. The brother was asked particularly to see to it that the child, Glen, was taken care of "if anything happened." It appears to us that the post-testamentary arrangement for the insurance for the wife might very well indicate, consistently with the fact of decedent's awareness of the contents of the will, a desire to soften its impact upon the welfare of the wife.
A physician who had treated the decedent intermittently over a period of ten years for chronic alcoholism testified that, in his opinion, Petkos, when under the influence of alcohol, would not be of a mental condition, in making his will, "to know those who would be the recipients of his bounty." The witness had not seen the decedent, however, since March or April 1956. He admitted that a habitual drinker "has lucid intervals during which he does have full control of his reason."
Mr. Goldfarb, the lawyer, testified that at the time the testator told him what he wanted in the will his "physical condition was all right" and that he was "coherent" and "explicit" as to what he wanted. However, he was at that *127 time "very vindictive. He hated his wife." When the will was prepared and the testator came in to read it, Goldfarb told him he did not think it provided adequately for the child during his minority and that Petkos responded "that was up to his wife; he didn't care about that, she would take care of him." At the time of the execution of the will, although Petkos "had a few drinks in him," his physical condition was "all right" and he was "in full possession of his faculties" at the time. Goldfarb read the will to him and he then read it to himself. Mrs. Fitzpatrick testified that she could not tell if Petkos had been drinking when she witnessed the will. "He looked all right" to her.
The leading case in this state on inebriety as affecting testamentary capacity is Bannister v. Jackson, 45 N.J. Eq. 702 (Prerog. 1889), affirmed 46 N.J. Eq. 593 (E. & A. 1890). See also Fluck v. Rea, 51 N.J. Eq. 233 (Prerog. 1893), affirmed 51 N.J. Eq. 639 (E. & A. 1893); Koegel v. Egner, 54 N.J. Eq. 623 (Prerog. 1896); In re Mannion's Estate, 86 N.J. Eq. 232 (E. & A. 1915). In each of these cases wills were held entitled to probate notwithstanding long and habitual addiction to intoxicants by the testator. The burden is upon the contestant to establish "incapacitating temporary insanity or drunkenness * * * at the very time[s]" when the will was made. Koegel v. Egner, supra (54 N.J. Eq. at page 629). In the Bannister case, supra, although the Ordinary was satisfied by the proofs that at the time the will was made the testator had become addicted to the excessive use of intoxicating liquors to the extent of impairing his mental and physical powers, this did not render him incompetent to "perform a legal act" when he was not under the immediate influence of intoxication. The court said (45 N.J. Eq. at page 705):
"The test of testamentary capacity in this state is that the testator can comprehend the property he is about to dispose of, the objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will. The capacity required is moderate, and, though the testator be subject to many infirmities, *128 though he be feeble, absent-minded, forgetful, aged, diseased, blind, or otherwise infirm, and yet possess the powers required by this test, he will be held to have testamentary capacity."
Distinguish In re Freeman's Will, 1 N.J. Misc. 642 (Orphans' Ct. 1923), where it was held that the effects of long protracted chronic alcoholism and addiction to drugs had produced a "fixed mental disease" depriving the testator of testamentary capacity. It was recognized there, however, as well as in the Bannister case, supra (45 N.J. Eq. at page 707), that "it is not the law that * * * one who is in the habit of excessive indulgence in strong drink must be wholly free from its influence" when making a will, so long as the condition does not amount to "fixed mental disease" or present a case of such excitement "by present intoxication" that the person is "not master of himself."
In the present case the trial judge expressed satisfaction "from all of the credible testimony that the testator, notwithstanding that he was a heavy drinker, had sufficient mental capacity on the day in question to execute a will." He appears to have been particularly impressed with the candor of the witnesses Goldfarb and Fitzpatrick. We are obliged to accord considerable weight to the superior position of the trial judge to estimate credibility in a case where, as here, credibility is a significant factor in resolving the factual issue being tried.
On the whole case, and applying the authorities cited, we cannot find that the trial court erred in its determination as to testamentary capacity, particularly since defendant had the burden of proof on the issue. Any repugnance the court may feel at the unnaturalness of the testament cannot be permitted to influence it to frustrate the testator's legal right to dispose of his property as he willed.
Judgment affirmed; no costs.